**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| **RICARDO MALBREW;** | § | |
| **FRANK HAMMOND; and** | § | |
| **NIJA HIGGINS,** | § | |
| _Plaintiffs,_ | § | |
| | § | |
| **vs.** | § | **Civil Action No. 3:20-cv-01364-E** |
| | § | **(Jury Demanded)** |
| **A+ CHARTER SCHOOLS d/b/a** | § | |
| **A+ ACADEMY,** | § | |
| _Defendant._ | § | |

## DEFENDANT'S BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Pursuant to Fed. R. Civ. P. 56 and L.R. 56.5(a), Defendant A+ Charter Schools d/b/a

A+ Academy, a Texas open-enrollment public charter school and subordinate unit of government

("Defendant" or "the School"), files this brief in support of its Motion for Summary Judgment.

Defendant's Summary Judgment Appendix will also be filed separately. _See_ L.R. 56.6.

# TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS ..................................................................................... i

TABLE OF AUTHORITIES ........................................................................... iv

I. SUMMARY ................................................................................................... 1

II. SUMMARY OF FACTS .............................................................................. 1

    A. Summary of Malbrew's Employment .................................................... 1

        1. Classroom Management Concerns and Incident with Lee's Son, N.L. .............. 2

        2. Concerns on Compliance with School Policy/Procedure .................................... 3

        3. Concerns Regarding Malbrew's Interactions with Students and Parents .......... 4

        4. Changes to Malbrew's Schedule .................................................................... 9

        5. Classroom Observation/Evaluation Disputes ................................................. 9

        6. Composite Certification Dispute .................................................................... 10

        7. Notice of Non-Renewal and Grievance ........................................................... 11

    B. Summary of Hammond's Employment .................................................... 12

        1. Hiring ............................................................................................................ 12

        2. Student Testing Issues..................................................................................... 13

        3. Hammond's Performance as Counselor ........................................................... 14

        4. Hammond's Scheduling Difficulties ............................................................... 14

        5. Grievance and Resignation ............................................................................. 15

    C. Summary of Higgins's Employment ....................................................... 16

        1. Hiring ............................................................................................................ 16

        2. Parking Lot Incident ...................................................................................... 16

3. Desire to Leave for Administrative Position .................................................. 17

4. November 13, 2018 Intercom Incident ............................................................ 17

5. "Surveillance" by A+ Secondary Employee ...................................................... 19

6. December 4, 2018 Meeting ............................................................................ 20

6. January 4, 2019 Resignation .......................................................................... 20

D. Lawsuit ........................................................................................................ 21

III. ARGUMENT: PLAINTIFFS' RACE / COLOR DISCRIMINATION
CLAIMS MUST FAIL ....................................................................................... 21

A. Legal Standard for Proving Race / Color Discrimination ........................................ 21

1. Malbrew's Claims of Race / Color Discrimination ............................................ 24

i. Malbrew's Performance Issues Show He Was Not
Qualified for the Position .............................................................................. 24

ii. There is No Evidence of Pretext ................................................................ 25

2. Hammond's Claims of Race / Color Discrimination ........................................... 32

i. Hammond Cannot Make a *Prima Facie* Showing of Discrimination ...... 32

3. Higgins's Claims of Race / Color Discrimination ............................................. 34

i. Higgins Cannot Make a *Prima Facie* Showing of Discrimination .......... 34

IV. ARGUMENT: PLAINTIFFS' RETALIATION CLAIMS MUST FAIL ........................ 36

A. Legal Standard for Proving Retaliation ................................................................... 36

B. Analysis ........................................................................................................ 37

1. Malbrew's Retaliation Claim Must Fail ............................................................ 37

2. Hammond's Retaliation Claim Must Fail .......................................................... 38

3. Higgins's Retaliation Claim Must Fail .............................................................. 41

V. ARGUMENT: PLAINTIFFS' HOSTILE WORK ENVIRONMENT CLAIMS ................ 43

    A. Legal Standard ..................................................................................... 43

    B. Analysis ............................................................................................. 44

        1. Malbrew's Claims of Hostile Environment Must Fail ......................... 44

        2. Hammond's Claims of Hostile Environment Must Fail ...................... 45

        3. Higgins's Claims of Hostile Environment Must Fail ......................... 46

VI. ARGUMENT: PLAINTIFFS' CONSTRUCTIVE DISCHARGE CLAIMS .................... 47

    A. Legal Standard ..................................................................................... 47

    B. Analysis ............................................................................................. 48

        1. Hammond's Constructive Discharge Claim Must Fail ...................... 48

        2. Higgins's Constructive Discharge Claim Must Fail .......................... 49

VII. ARGUMENT: DEFENDANT'S IMMUNITY FROM LIABILITY
FROM SECTION 1981 CLAIMS ........................................................................ 50

VIII. CONCLUSION AND PRAYER ................................................................... 52

CERTIFICATE OF SERVICE ............................................................................ 54

**TABLE OF AUTHORITIES**

| Cases | Page |
|---|---|

*Alvarado v. Tex. Rangers*, 492 F.3d 605 (5th Cir. 2007)..........................................................33

*Armendariz v. Pinkerton Tobacco Co.*, 58 F.3d 144 (5th Cir.1995)..................................28, 42

*Armstrong v. Cumberland Acad.*, No. 6:20-CV-00526, 2021 WL 3207947
(E.D. Tex. July 15, 2021)..........................................................................................................52

*Aryain v. Wal-Mart Stores Tex. LP*, 534 F.3d 473 (5th Cir. 2008).........................................36

*Auguster v. Vermillion Parish Sch. Bd.*, 249 F.3d 400 (5th Cir. 2001) ...................................29

*Ako-Doffou v. Univ. of Tex.*, 71 F. App'x. 440, 2003 Wl 2141748 (5th Cir. 2003) ................23

*Bryant v. Compass Group USA, Inc.*, 413 F.3d 471 (5th Cir. 2005) ........................................22

*Brown v. CSC Logic, Inc.*, 82 F.3d 651 (5th Cir. 1996) ...........................................................23

*Brown v. Kinney Shoe Corp.*, 237 F.3d 556 (5th Cir. 2001)..............................................*passim*

*Burton v. Freescale Semiconductor, Inc.*, 798 F.3d 222 (5th Cir. 2015)............................ 22-23

*Cephus v. Tex. Health & Hum. Servs. Comm'n*, 146 F. Supp. 3d 818 (S.D. Tex. 2015) ...51, 52

*Cervantez v. KMGP Servs. Co. Inc.*, 349 Fed. App'x. 4 (5th Cir. 2009)................................27

*Chapple v. Tex. Health and Human Servs Comm'n*, 789 Fed. App'x. 985 (5th Cir. 2019) .....37

*Clark v. Tarrant County, Tex.*, 798 F.2d 736 (5th Cir. 1986)..................................................52

*Delaval v. PTech Drilling Tubulars, LLC*, 824 F.3d 476 (5th Cir. 2016) ...............................23

*El Paso Educ. Initiative, Inc. d/b/a Burnham Wood Charter School v.
Amex Properties, LLC*, 602 S.W.3d 521 (Tex. 2020).............................................................51

*Evans v. City of Houston*, 246 F.3d 344 (5th Cir. 2001).........................................................36

*Everett v. Cent. Miss, Inc. Head Start Program*, 444 Fed. App'x. 38 (5th Cir. 2011)............36

*Garcia v. Prof'l Contract Servs, Inc.*, 938 F.3d 236 (5th Cir. 2019)......................................37

*Grimes v. Tex. Dep't of Health*, 102 F.3d 137 (5th Cir. 1996)...................................22, 25, 36

*Haley v. All. Compressor LLC & Copeland Corp.*, 391 F.3d 644 (5th Cir. 2004) ..................44

*Hernandez v. Crawford Bldg. Material Co.*, 321 F.3d 528 (5th Cir. 2003) ............................31

*Hernandez v. Yellow Transp., Inc.*, 670 F.3d 644 (5th Cir. 2012)....................................21, 43

*Hervey v. Miss. Dep't of Educ.*, 404 Fed. App'x 865 (5th Cir. 2010) .....................................32

*Jett v. Dallas Indep. Sch. Dist.*, 798 F.2d 748 (5th Cir. 1986)..................................................48

*Jones v. Dallas County*, 47 F. Supp. 3d 469 (N.D. Tex. 2014) .........................................43, 44

*Lapides v. Bd. of Regents of the Univ. Sys. of Ga.*, 535 U.S. 613 (2002) ...............................50

*Little v. Republic Ref. Co. Ltd.*, 924 F.2d 93 (5th Cir. 1991)..................................................32

*Martin v. Kroger Co.*, 65 F. Supp. 2d 516 (S.D. Tex. 1999) ...................................................36

*Mayberry v. Vought Aircraft Co.*, 55 F.3d 1086 (5th Cir. 1995).............................................32

*McCoy v. City of Shreveport*, 492 F.3d 551 (5th Cir. 2007)....................................................22

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) .....................................................21

*Meyers ex rel. Benzing v. Texas*, 410 F.3d 236 (5th Cir. 2005)..............................................51

*Odubela v. Exxon Mobil Corp.*, 736 F. App'x 437 (5th Cir. 2018).........................................27

*Perez v. Region 20 Educ. Serv. Ctr.*, 307 F.3d 318 (5th Cir. 2002).........................................51

*Price v. Marathon Cheese Corp.*, 119 F.3d 330 (5th Cir. 1997) .......................................28, 42

*Price v. Wheeler*, 834 Fed. App'x. 849 (5th Cir. 2020)......................................................32, 34

*Roberson-King v. La. Workforce Comm'n, Office of Workforce Dev.*,
904 F.3d 377 (5th Cir. 2018) .....................................................................................................22

*Salinas v. AT&T Corp.*, 314 Fed. App'x 696 (5th Cir. 2009)............................................28, 42

*Serna v. City of San Antonio*, 244 F.3d 479 (5th Cir. 2001).....................................................33

*Sessions v. Rusk State Hosp.*, 648 F.2d 1066 (5th Cir. 1981 ...................................................51

*Shackelford v. Deloitte & Touche, LLP*, 190 F.3d 398 (5th Cir. 1999)...................................21

*Spears v. Patterson UTI Drilling Co.*, 337 Fed. App'x. 416 (5th Cir, 2009) ..........................23

*Stewart v. Miss. Transp. Comm'n*, 586 F.3d 321 (5th Cir. 2009)..............................................42

*Thompson v. City of Waco, Tex.*, 764 F.3d 500 (5th Cir. 2014) ................................................31

*Walker v. Tex., Office of Atty. Gen.*, 217 F. Supp. 2d 776 (E.D. Tex. 2002)..........................51

*Wallace v. Seton Family of Hosps.*, 777 Fed. App'x 83 (5th Cir. 2019) .................................23

*Williams v. U.S. Dept. of the Navy*, 149 Fed. App'x. 264 (5th Cir. 2005)...............................31

## State Statutes

TEX. EDUC. CODE §12.104(b) ....................................................................................................14

TEX. EDUC. CODE §33.002 .......................................................................................................14

# I.   SUMMARY

The School moves for summary judgment on each and every one of Plaintiffs' claims under Title VII of the Civil Rights Act of 1964 ("Title VII"),[1] the Texas Commission on Human Rights Act ("TCHRA"),[2] and 42 U.S.C. §1981 ("Section 1981") for (1) race or color-based discrimination, (2) retaliation, and (3) hostile work environment. Each of the required elements of Plaintiffs' claims that this Motion seeks to defeat will be set forth in the body of this brief. Further, Defendant seeks dismissal with prejudice of Plaintiffs' claims under 42 U.S.C. §1981 because the School has immunity from liability under the Eleventh Amendment to the United States Constitution.

# II.   SUMMARY OF FACTS

Each of the Plaintiffs began employment with Defendant during the 2018-2019 school year and were assigned to work at Defendant's A+ Academy Secondary School ("A+ Secondary"). Plaintiffs Ricardo Malbrew ("Malbrew") and Nija Higgins ("Higgins") were employed as teachers, and Plaintiff Frank Hammond ("Hammond") was employed as a counselor. Norman Lee, Sr. ("Lee") was the Principal at A+ Secondary during the 2018-2019 school year. *See* Affidavit of Norman Lee, III ("Lee Affidavit") attached hereto as **Exhibit A**, at ¶ 3 (Appendix p. 2).

## A.    Summary of Malbrew's Employment

Malbrew was hired by Defendant during the 2018-2019 school year and was assigned to a social studies teaching role at A+ Academy. Lee Affidavit at ¶ 4 (Appendix p. 2). As reflected below, A+ Secondary had many documented incidents and concerns related to Malbrew's performance.

---

[1] 42 U.S.C. §2000e *et seq.*
[2] Tex. Labor Code §21.001 *et seq.*

1. <u>Classroom Management Concerns and Incident with Lee's son, N.L.</u>

Lee's son, N.L., was a student in Malbrew's class. Deposition Transcript of Ricardo Malbrew ("Malbrew Depo.") attached hereto as **Exhibit B**, at p. 21:1-22 (Appendix p. 173). During a classroom discussion about immigration on or about September 11, 2018, N.L. made a statement to the effect that "illegal immigrants coming across the border should be shot." Malbrew Depo. at pp. 19:23-20:11 (Appendix p. 172). Malbrew testified that he calmed the classroom down, given that there were many children of undocumented immigrants. Malbrew Depo. at pp. 27-29 (Appendix pp. 174-175). In later speaking with Lisa Campbell ("Campbell"), an Assistant Principal at A+ Academy, about this incident, Malbrew shared that his class frequently discussed current events, and students are allowed to state their positions and views. Lee Affidavit at ¶ 48, Exhibit A-19 (Appendix pp. 6, 150, 151). N.L. informed Campbell that Malbrew had tried to "heat up the conversation" by asking more questions and when N.L. had tried to answer, Malbrew would not listen but instead "theatrically threw [his] head into [his] hands and sighed loudly." *Id.* N.L. reported that he overheard other students threaten him, but Malbrew did not stop them; rather, N.L. alleged that the threats of violence against him continued. *Id.*

After speaking with Campbell, Malbrew received a letter from her stating that he had not met the expectation that he would maintain a safe and supportive learning environment for all students. *Id.* Campbell told Malbrew that she expected he would meet expectations by refraining from engaging in controversial topics that may engage students in confrontational dialogue and provide a safe academic learning environment for all students while modeling and providing the opportunity for students to demonstrate appropriate conduct. *Id.*

Malbrew repeatedly testified that any alleged unfair treatment by Lee was the direct result of the classroom incident involving N.L. Malbrew Depo. at p. 48:5-8 (Appendix p. 179) (Q: "So you were fired because of [N.L.]'s comments in your classroom on September 11, 2018? A. I

believe it was the culprit, yes."); p. 56:6-8 (Appendix p. 181) (Q. "Retaliation because of something his son said? A. Correct."); p. 68:15-22 (Appendix p. 184) (Q. "Retaliation because of what his son said in your classroom? [Objection to form] A. That's the culprit. And I was – you know, I was a pretty – pretty good darn good teacher. So why would you remove a darn good teacher out of history and put him in CTE? There's no rhyme or reason for it. That's basically what I'm saying."); p. 94:10-14 (Appendix p. 191) (Q. "Do you feel that your schedule was changed because of the incident involving Mr. Lee's son back in September of 2018 and the comments made in your classroom? A. I do.").

### 2. Concerns on Compliance with School Policy/Procedures

Malbrew also had to be counseled regarding his unwillingness to use the School's time-keeping system and his tardiness. For instance, in February 2019, Lee asked Campbell to address the fact that Malbrew had been late and not reporting to his duty station regularly. Lee Affidavit at ¶ 6, Exhibit A-1 at 29 (Appendix pp. 3, 36). Lee noted that other teachers were complaining that it was unfair that Malbrew was not covering his duty post while they were being asked to do so.[3] Lee Affidavit at ¶ 6, Exhibit A-1 at 29 (Appendix pp. 3, 36). Campbell documented that she had received a complaint from another employee that it was very difficult to "explain to other members of the department the importance of promptness and serving your duty station when assigned when Mr. Malbrew is never carrying his part of the weight." Lee Affidavit at ¶ 49, Exhibit A-20 (Appendix pp. 6, 153). Campbell suggested that she could meet with Malbrew during his planning period to discuss clocking in and out, duty assignments and expectations, and noted there was "so much more that needs to be reviewed with him." *Id.* One month later, Malbrew still was not

---

[3] Lee also asked that Campbell discuss with Malbrew a recent parent complaint and another situation involving Malbrew. Lee Affidavit at ¶ 8, Exhibit A-1 at 28 (Appendix pp. 3, 35).

complying with the clocking in and out requirement. Lee Affidavit at ¶¶ 7, 8, Exhibit A-1 at 27 (Appendix pp. 3, 34).

Additionally, on March 19, 2019, Malbrew gave a student-athlete a ride home from school. Lee Affidavit at ¶¶ 7, 8, Exhibit A-1 at 39 (Appendix pp. 3, 46). The School considers this practice unacceptable as noted in its safety trainings, and the practice is strongly discouraged by the Texas Education Agency in ethics and safety training. Lee Affidavit at ¶¶ 7, 8, 9, Exhibit A-1 at 39 (Appendix pp. 3, 46). In an email dated March 21, 2019, Malbrew was counseled on refraining from this practice. *Id*.

On March 27, 2019, Malbrew escorted students from his CTE class to other classrooms and engaged in discussions with teachers that "could be misconstrued as not agreeing with how or what they were teaching their students." Lee Affidavit at ¶¶ 7, 8, Exhibit A-1 at 12-13 (Appendix pp. 3, 19, 20). On April 1, 2019, Campbell again clarified the scheduling consistent with the announced changes, and asked Malbrew to follow the lesson plans left by the Department Chair and teacher of record, Cathy Holdbrook. Lee Affidavit at ¶ 50, Exhibit A-21 (Appendix pp. 6, 155, 156). Just four days later, on April 5, 2019, instead of following the lesson plan that Holdbrook had left, Malbrew showed an R-rated movie in class. Lee Affidavit at ¶¶ 7, 8, Exhibit A-1 at 20-21 (Appendix pp. 3, 27, 28). Lee addressed this with Malbrew, who said that Lee should not assume that Holdbrook left instructions. Lee Affidavit at ¶¶ 7, 8, Exhibit A-1 at 20-21 (Appendix pp. 3, 27, 28). However, Holdbrook had informed Lee that she provided instructions, and Malbrew had been directed only days previously by Campbell to follow Holdbrook's lesson plan. *Id*.

3.   Concerns Regarding Malbrew's Interactions with Students and Parents

On November 9, 2018, a student reported that Malbrew told the class that he would only focus on ten students in the entire classroom and, after naming those students, stated "the rest of

4

y'all are on your own." Lee Affidavit at ¶¶ 7, 8, Exhibit A-1 at 62 (Appendix pp. 3, 69). The student also reported that Malbrew told the class that if parents called him to complain about their child's grades, he would tell them that "it's not my fault, sorry" and then he would "hang up in their face." *Id.*

On November 27, 2018, Malbrew sent a student out of his class. Lee Affidavit at ¶¶ 7, 8, Exhibit A-1 at 30 (Appendix pp. 3, 37). The student was found in the hallway by a coach. The student was visibly upset and had tears in his eyes. *Id.* When the coach asked what was wrong, the student stated that Malbrew had put him out of the class because he told Malbrew that he could not read aloud. *Id.* When Malbrew insisted he read aloud, the student said he did not want to be embarrassed, and Malbrew sent him out of the class. *Id.* The coach took the student to Kevin Spurgin ("Spurgin"), the Dean of Instruction, and told Lee about the incident. *Id.* Spurgin took the student to his office to ask what happened, and the student explained that Malbrew asked him to read aloud in front of the class, and that as he started reading, he began to struggle with the words, got nervous, and stopped reading as a result. Lee Affidavit at ¶¶ 7, 8, Exhibit A-1 at 32 (Appendix pp. 3, 39). When Malbrew told him to continue reading, the student said that he could not because he was having trouble. *Id.* According to the student, Malbrew told the class that he did not understand why students "who grew up speaking Spanish are reading better than students who grew up speaking English," and Malbrew also said "money comes out of my paycheck every month to teach kids how to read." *Id.* Malbrew then told the student to leave the room and go to the office so "they could deal with him." *Id.* Spurgin noted that the student told him that he could read, but that he got nervous when reading in front of others and would start to stutter. Lee Affidavit at ¶¶ 7, 8, Exhibit A-1 at 32 (Appendix pp. 3, 39). Spurgin noted that the student began to cry harder and said that he has trouble with some words and gets scared when reading out loud.

Lee Affidavit at ¶¶ 7, 8, Exhibit A-1 at 32 (Appendix pp. 3, 39). Spurgin comforted and counseled the student and promised to follow up with Malbrew.[4] *Id.*

On November 27, 2018, Lisa Hettich ("Hettich"), a teacher across the hall from Malbrew's room, overheard Malbrew cursing at who she assumed to be a student in his classroom, telling the student "quit being an ass." Lee Affidavit at ¶¶ 7, 8, Exhibit A-1 at 34 (Appendix pp. 3, 34).

On November 28, 2018, a student reported that in Malbrew's class, "we were not doing anything but hearing him talk about other students and [their] grades." Lee Affidavit at ¶¶ 7, 8, Exhibit A-1 at 63 (Appendix pp. 3, 70). The student also reported that Malbrew had used foul language such as "dumbasses" and the "S word," "mostly when he gets mad." *Id.*

On December 3, 2018, Hettich recounted to Lee that Malbrew was angry at a student in the hall and yelled at the student. Lee Affidavit at ¶¶ 7, 8, Exhibit A-1 at 35 (Appendix pp. 3, 42). Another teacher, Michael Will, also heard Malbrew yell at a student on the same day. Lee Affidavit at ¶¶ 7, 8, Exhibit A-1 at 36 (Appendix pp. 3, 43). Teacher Shanice Martin witnessed the same incident, which she described as a "loud commotion" that she and her students could hear in the hallway. She stated she observed Malbrew "yelling into the 8th grade science room." Lee Affidavit at ¶¶ 7, 8, Exhibit A-1 at 54 (Appendix pp. 3, 61). Another employee, Rosemary Duran, also heard Malbrew yelling and noted that it scared her. Lee Affidavit at ¶¶ 7, 8, Exhibit A-1 at 56 (Appendix pp. 3, 63). A parent of one of the children involved in the December 3 incident with Malbrew received a call from Lee and felt satisfied after that call. The parent then received a call from Malbrew, which she perceived as rude and that she felt intimidated by Malbrew. Lee Affidavit at ¶¶ 7, 8, Exhibit A-1 at 48-52 (Appendix pp. 3, 55-59). Her child asked not to return to Malbrew's class. *Id.*

---

[4] The child also wrote a statement detailing these events. Lee Affidavit at ¶¶ 7, 8, Exhibit A-1 at 65 (Appendix pp. 3, 62).

Malbrew wrote to the School's Human Resources Department on the evening of December 3, 2018, blaming a lack of administrative support for his disciplinary approach, and citing that day's events as an example. *See* Affidavit of William Lister ("Lister Affidavit") attached hereto as **<u>Exhibit D</u>**, at ¶¶ 4, 5, Exhibit D-1 (Appendix pp. 348, 351-353). Malbrew stated that he had been disrespected by a student and had characterized his actions that brought multiple teachers out of their classrooms to investigate the yelling as a "scolding." Lister Affidavit at ¶¶ 4, 5, Exhibit D-1 (Appendix pp. 348, 351-353). Malbrew himself, however, would go on to note that he "boldly and vocally" informed the child that he was not going to be allowed to blatantly disrespect him. Malbrew noted that Lee sent him home to "cool off." *Id.* Malbrew did not mention anything regarding race, racial discrimination, or discrimination of any kind in this email to Human Resources. *Id.*

On January 25, 2019, the School received a complaint from a parent that Malbrew had screamed at a student because she was unable to answer a question. Lee Affidavit at ¶¶ 7, 8, Exhibit A-1 at 45-47 (Appendix pp. 3, 52-54). According to the complaint, Malbrew then asked the student, whose parent drafted the complaint in Spanish, if she wanted him to speak in Spanish. *Id.* When the student did not answer Malbrew's question, he told her with that attitude she would "never be anybody in life." *Id.*

Also on January 25, 2019, Travis Gilmore, a teacher in Malbrew's department, made a statement about Malbrew's behavior. Lee Affidavit at ¶¶ 7, 8, Exhibit A-1 at 40 (Appendix pp. 3, 47). Gilmore noted that on various occasions Malbrew entered Gilmore's class on what was supposed to be Malbrew's special education inclusion period, detracting from Gilmore's instruction of his students. Lee Affidavit at ¶¶ 7, 8, Exhibit A-1 at 40 (Appendix pp. 3, 47). Gilmore complained that Malbrew would eat lunch in the back of his classroom, interrupting his instruction,

interrupting students when they were addressing a question toward Gilmore, interrupting class discussions, changing the topic of the class to something academically irrelevant, and using vulgarities and coarse language. *Id.* Gilmore stated that he personally witnessed Malbrew say the words "damn," "ass," "shit," and "fuck" in front of students. *Id.* Gilmore stated that the use was an everyday occurrence when Malbrew visited his class. *Id.* Gilmore complained that his students were bothered by Malbrew's visits and expressed this to him on many occasions. Lee Affidavit at ¶¶ 7, 8, Exhibit A-1 at 40 (Appendix pp. 3, 47). Gilmore said he raised these issues with the department head, Kevin Faulk. *Id.*

On February 22, 2019, a parent wrote to Campbell to complain about Malbrew's discussion with her regarding marking his daughter absent. The parent noted that Malbrew's tone and responses in their discussion were not necessary, and asked Campbell to speak with Malbrew regarding how he speaks to parents. Lee Affidavit at ¶ 51, Exhibit A-22 (Appendix pp. 6, 158).

On March 18, 2019, Spurgin overheard Malbrew yelling at a student, saying "Texas state law says I don't have to have you in my classroom." Lee Affidavit at ¶¶ 7, 8, Exhibit A-1 at 37 (Appendix pp. 3, 44). Spurgin said that the student informed him that Malbrew had a student teaching the class and was giving that student a hard time. *Id.* When the student who was in the hall defended the student teaching the class, Malbrew told him to "get out of his room." *Id.*

On April 4, 2019, Victoria Torres, a special education inclusion teacher, reported that the previous day Malbrew identified that some students in his class had "two teachers" and asked her "which of these kids in here are yours?" Lee Affidavit at ¶ 52, Exhibit A-23 (Appendix pp. 6, 160). Torres felt that Malbrew was asking her to disclose the special education status of specific students in front of their peers. *Id.* Torres also disclosed an incident of Malbrew "very rudely" berating a student for not knowing the answer to a question about European colonization in Africa. *Id.* Torres

characterized the interaction as "unprofessional" and intervened so the class could move on. *Id*. In reporting the incident to Campbell, Torres further characterized this incident as "alarming." Lee Affidavit at ¶ 52, Exhibit A-23 (Appendix pp. 6, 160).

### 4. Changes to Malbrew's Schedule

One of the major claims raised by Malbrew is that Defendant discriminated against him in the form of several classroom schedule changes instituted by Lee during the 2018-2019 school year. Pet. at ¶ 20. The School acknowledges that Malbrew's schedule was changed on occasion; for instance, on January 11, 2019, Lee emailed Malbrew about a change in his schedule, which included changing his 8th period athletics class to a social studies special topics class. Lee Affidavit at ¶¶ 10, 11, Exhibit A-2 (Appendix pp. 3, 81). This move was approved by Athletic Director Tarance Lewis. *Id.*

On March 20, 2019, Malbrew emailed Faulk and Lee regarding a prior meeting about changing schedules in order to bring up standardized testing scores. In that email, Malbrew expressed if changing his students' schedules was the consensus decision, he was "fine with it." Lee Affidavit at ¶¶ 12, 13, Exhibit A-3 (Appendix pp. 3, 83). The scheduling changes were formally announced in a March 22, 2019 email. Lee Affidavit at ¶¶ 7, 8, Exhibit A-1 at 70 (Appendix pp. 3, 77). Malbrew admitted that after these scheduling changes, his core responsibilities as a teacher were unchanged, and his salary and benefits remained unchanged. Malbrew Depo. at p. 58 (Appendix p. 182).

### 5. Classroom Observation/Evaluation Disputes

When the scheduling changes Malbrew indicated that he was "fine with" were announced through the March 22, 2019 email to the Social Studies department, Malbrew replied that it was unfair that he must undergo his classroom observation without his 8th grade students present. Lee

Affidavit at ¶¶ 7, 8, Exhibit A-1 at 68-72 (Appendix pp. 3, 75-79). Lee responded, thanking him for sharing the concern, and suggesting that he be observed during one of the two social studies special topics classes he had taught all semester. *Id.* Malbrew declined, stating that that those classes were electives. *Id.* Lee reminded Malbrew that he had all year to schedule his evaluation, but Malbrew had waited until after Spring Break, despite being told that scheduling changes could occur after campus benchmarks. Lee Affidavit at ¶¶ 7, 8, Exhibit A-1 at 68-72 (Appendix pp. 3, 75-79). Lee reminded Malbrew that the observation was not optional, and that his special topics classes were on topics Malbrew selected. *Id.* Lee offered to discuss the issue the following Monday; Malbrew responded that he would accept the meeting, but he would not respond to any suggestions beyond what he had previously requested. *Id.*

In his Petition, Malbrew now complains that his evaluation was not conducted until after he had been non-renewed. Pet. at ¶ 48. It is true that at the time Malbrew was informed of his non-renewal, his classroom observation had not been conducted. However, he had the entire school year to schedule his required classroom observation and failed to do so. Lee Affidavit at ¶¶ 7, 8, Exhibit A-1 at 68-72 (Appendix pp. 3, 75-79).

6.     Composite Certification Dispute

On February 21, 2019, Lee emailed Malbrew to see if he had contacted the Texas Education Agency ("TEA") to see whether he had any more opportunities to take the social studies composite certification test,[5] and reminded him that they had discussed in interviews and meetings that social studies teachers need to obtain a composite certification. Lee Affidavit at ¶¶ 14, 15, Exhibit A-4 (Appendix pp. 3, 85-87). Lee stated he needed to know what options Malbrew had regarding possible classes as he was beginning to look at the master schedule for next year. *Id.* Malbrew said

---

[5] A composite certificate allows teachers to teach courses covered under the state's social studies curriculum. Lee Affidavit at ¶ 14 (Appendix p. 3).

he would check with TEA, but went on to say history was his "wheelhouse" and "economic [*sic*] and psychology not so much." *Id.*

Less than twenty minutes after telling Lee that he would check into the certification with TEA, Malbrew instead asked William Lister, Director of Human Resources ("Lister"), whether there was a School mandate to become composite certified. Lee Affidavit at ¶¶ 14, 15, Exhibit A-4 (Appendix pp. 3, 85-87). Malbrew stated there was a "questionable effort to apply undue stress and pressure for **the entire Social Studies department**, middle school included, to be high school Social Studies composite."[6] *Id.* Lister informed Malbrew that there was no School mandate to become composite certified, but it "provides Admin greater flexibility as they prepare next year's schedules, so they're encouraging teachers to become composite." *Id.*

Lee confirmed to HR that Malbrew was not the only teacher he was asking to get composite certified. Lee Affidavit at ¶¶ 16, 17, Exhibit A-5 (Appendix pp. 3, 89, 90). He noted that Malbrew and two other teachers were informed that this would be an "ask" when they were hired, as well as throughout the year in department meetings. *Id.* The two other teachers were working on certification and had plans to test that summer after they completed an alternative certification program. *Id.*

### 7. Notice of Non-Renewal and Grievance

On April 10, 2019, Lee made a recommendation not to renew Malbrew's at-will employment for the next school year. Lee Affidavit at ¶¶ 7, 8, Exhibit A-1 (Appendix pp. 3, 8-72). Lee's decision was supported by 71 pages of documentation outlining Malbrew's multiple

---

[6] In stark contrast to the contemporaneous statement that the requirement was stressed to the entire department, once Malbrew filed his lawsuit, his story became that he was the only one who received stress regarding certification. Malbrew Depo. at p. 98 (Appendix p. 92) ("Q. Is it your testimony that you were the only social studies teacher asked or talked to about getting a composite certification? A. It's my testimony that I was the only social studies teacher where it was stressed.").

instances of student and parent mistreatment, his use of foul language in front of students, his refusal to follow policy regarding clocking in and out, failure to seek composite certification, and his failure to schedule his classroom observation. *Id.* Lee's memorandum noted that Malbrew had met with campus administrators on no less than 12 occasions to discuss issues related to his performance. *Id.* On April 12, 2019, Malbrew was informed his at-will employment agreement would not be renewed for the 2019-2020 school year. Malbrew Depo. at p. 120:8-19 (Appendix p. 197); Lee Affidavit at ¶ 18, Exhibit A-5.1 (Appendix pp. 3, 92). Then, on April 18, 2019, Malbrew filed a Level 1 grievance alleging discrimination and other unlawful conduct by Lee. Lee Affidavit at ¶¶ 19, 20, Exhibit A-6 (Appendix pp. 4, 94-95). Because the grievance discussed complaints against Lee, the grievance was investigated by Deputy Superintendent Brian Francis ("Francis"). Deposition of Brenton White ("White Deposition"), attached hereto as **Exhibit E**, at p. 54:3-13, Exhibit 3 (Appendix pp. 373, 429-436).

**B.  Summary of Hammond's Employment**

1.  <u>Hiring</u>

Hammond was hired on at at-will basis as a counselor at A+ Secondary; his employment began on August 31, 2018. Lee Affidavit at ¶¶ 21, 22, Exhibit A-7 (Appendix pp. 4, 97-98); Deposition of Frank Hammond ("Hammond Depo.") attached hereto as **Exhibit F**, at p. 38:10-19 (Appendix p. 484). Lee was involved in Hammond's interview process prior to his hiring. Hammond Depo. at p. 38:10-19 (Appendix p. 484). Hammond also performed duties as a Campus Testing Coordinator ("CTC") during portions of the 2018-2019 school year. As principal, Lee supervised Hammond. Lee Affidavit at ¶ 21 (Appendix p. 4).

## 2. Student Testing Issues

Hammond alleges that Lee took his duties as CTC away, and gave them to Spurgin, who is white, and that he was nominally kept in the CTC position in name only. Hammond Depo. at pp. 141-142 (Appendix p. 510). Hammond testified that he did not know why his CTC duties were changed, but has nonetheless attributed it to Lee's alleged anger with him over "what happened with Mr. Malbrew" and the fact that he sat in a meeting between Higgins and Lee. Hammond Depo. at p. 142 (Appendix p. 510). However, Hammond testified that, even after his testing coordinator duties were removed, he continued to perform duties as counselor for the school, and his salary remained the same. Hammond Depo. at p. 145:12-19 (Appendix p. 511).

The CTC duties were reassigned from Hammond in January 2019 due to testing issues during the December 2018 administration of an End-of-Course ("EOC") portion of the State of Texas Assessments of Academic Readiness ("STAAR") exam, which students must pass to graduate.[7] Lee Affidavit at ¶ 23 (Appendix p. 4). Specifically, one student taking an EOC exam was found to have his cell phone during testing, and to have taken a picture of the writing prompt and essay. Lee Affidavit at ¶¶ 23, 24, Exhibit A-8 (Appendix, pp. 4, 100-102). Additionally, two students who were exempt from taking an EOC assessment were given the test despite their exempt status. *Id.* While Hammond was not directly responsible for these issues, they occurred under his watch as CTC and the campus administration decided to reassign the CTC role to Spurgin. *Id.* After this reassignment, Hammond and DeShandra O'Neal (another high school counselor) served as Testing Assistants to Spurgin. *Id.* This did not impact Hammond's salary or employment benefits in any way. *Id.*

---

[7] The STAAR exam is a series of standardized tests used in Texas public schools to measure student achievement and knowledge learned in certain grade levels and courses.

### 3. Hammond's Performance as Counselor

Hammond testified that his duties as counselor were supervised by two white people who dictated what his duties were going to be every day. Hammond Depo. at pp. 145:23-146:6 (Appendix p. 511). Hammond complained that neither of these two persons were certified as counselors, as he is.[8] Hammond Depo. at p. 146:11-19 (Appendix p. 511).

Hammond's annual evaluation showed "areas to improve" which included "following campus/district procedures related to scheduling" and "collaboration and communication with colleagues." Lee Affidavit at ¶¶ 25, 26, Exhibit A-9 (Appendix pp. 4, 104). Hammond's goals were stated as "[d]ecreased scheduling corrections needed in CTE areas, and duplication of courses already taken[;] Adherence to all campus and district procedures through collaboration." *Id.* Hammond did not rebut this information and signed indicating "[m]y supervisor and I have discussed this annual evaluation and we have used District reports and documents to support the ratings." *Id.* Despite these issues, Hammond was offered continued employment for the 2019-2020 school year, and he accepted this offer. Lee Affidavit at ¶¶ 27, 28, Exhibit A-10 (Appendix pp. 4, 109, 110).

### 4. Hammond's Scheduling Difficulties

On November 29, 2018, Gail Moore, a diagnostician intern, wrote to Lee that Hammond had been giving conflicting information to stakeholders at Admission, Review and Dismissal ("ARD") meetings for special education students. Lee Affidavit at ¶¶ 28, 29, Exhibit A-11 (Appendix pp. 4, 112). This information involved the amount of credits needed to graduate, CTE

---

[8] Open-enrollment charter schools, like Defendant, are not subject to the requirement that counselors be certified by the State. *See* Tex. Educ. Code §12.104(b) (listing requirements to which open-enrollment charter schools are subject, not listing Tex. Educ. Code §33.002).

credits, and coding. *Id*. Further, Moore indicated that Hammond could not determine what specific classes a senior needed to earn a diploma endorsement. *Id*.

On January 8, 2019, Campbell wrote to Lee stating that Hammond would not change a student's schedule after being asked to do so. Lee Affidavit at ¶ 53, Exhibit A-24 (Appendix pp. 6, 162). Campbell cited an audit that confirmed that the student's schedule needed to be updated in order for him to graduate. *Id.* On January 30, 2019, Campbell agreed to meet with Hammond. Lee Affidavit at ¶ 55, Exhibit A-26 (Appendix pp. 6, 166). Hammond previously wrote to Campbell asking how to place students in CTE classes so that it would not create errors and duplicate courses. *Id.* On February 18, 2019, Campbell had to check in on Hammond changing a student's schedule after Lee had discussed the student's need with Hammond the week prior. Lee Affidavit at ¶ 54, Exhibit A-25 (Appendix pp. 6, 164).

### 5. Grievance and Resignation

On February 15, 2019, Hammond reached out to Jimmy Trotter ("Trotter"), the School's Executive Director of Human Capital, and reported that he was considering filing a grievance against Lee, as Lee was allegedly "creating [a] hostile work environment." Affidavit of Jimmy Trotter ("Trotter Affidavit") attached hereto as **Exhibit G**, at ¶¶ 4, 5, Exhibit G-1 (Appendix pp. 694, 697). However, when Trotter spoke with Hammond, he did not mention anything related to race. Trotter Affidavit at ¶ 6 (Appendix p. 694).

As noted earlier, Hammond was offered employment for the 2019-2020 school year as a counselor. Lee Affidavit at ¶¶ 27, 28, Exhibit A-10 (Appendix pp. 4, 109, 110). Although Hammond initially accepted the offer of employment, he later submitted his resignation effective August 2, 2019. Lee Affidavit at ¶ 27, Exhibit A-9.1 (Appendix pp. 4, 106, 107); Hammond Depo. at p. 179:15-25 (Appendix p. 519); Pet. at ¶ 50. On June 20, 2019, and prior to submitting his

resignation, Hammond filed a grievance alleging unlawful employment practices, including race discrimination, by Lee. Lee Affidavit at ¶¶ 32, 33, Exhibit A-12 (Appendix pp. 5, 114-121).

### C. Summary of Higgins's Employment

#### 1. Hiring

Lee recommended hiring Higgins, and on August 8, 2018, she accepted an offer to join A+ Secondary as a Career and Technical Education (CTE) teacher. Deposition of Nija Higgins ("Higgins Depo.") attached hereto as **Exhibit H**, at pp. 23:3-11, Exhibits 3 and 4; p. 35:1-10 (Appendix pp. 704, 777-780). Higgins alleged that she was promised a department chair position by Lee, but clarified in her deposition that Lee had said that there would be a department chair position open, and that she did not recall that she was specifically told that she would be the department chair. Higgins Depo. at pp. 46:3-47:25 (Appendix p. 710). Higgins interviewed for the department chair position, and the position was given to another employee, Cathy Holdbrook. Lee Affidavit, at ¶ 34 (Appendix p. 5). Higgins now claims that Holdbrook was not as qualified as she was for the department chair position, but she also testified that her only basis for this belief was that Higgins had a "principal's license" and Holdbrook had less than 20 years of experience. Higgins Depo. at pp. 55:6-56:13 (Appendix p. 712).

#### 2. Parking Lot Incident

In her Petition, Higgins cites to an alleged incident involving a security guard who had a dispute with a parent over parking lot rules. Higgins Depo. at p. 60:2-19 (Appendix p. 713); Pet. at ¶ 6. Higgins has testified that on the date of the alleged incident, Campbell came to her office and "tried to pressure her into writing a letter condemning the actions of [the security guard]." Higgins Depo. at p. 83:18-24 (Appendix p. 719). Higgins stated she wrote a factual account that did not indicate that the guard was the aggressor. Higgins Depo. at p. 84:4-12 (Appendix p. 719).

Higgins acknowledged that she was not told she would be terminated for writing this account and that she was not reprimanded or counseled for giving the account. Higgins Depo. at pp. 84:13-85:11 (Appendix pp. 719, 720). She was not threatened with termination, reprimand or counseling, was not docked pay nor were her duties as a teacher removed as a result of this statement. *Id.*

### 3. Desire to Leave for Administrative Position

On November 2, 2018, less than 90 days after accepting the CTE teacher position, Higgins contacted Lister to advise that she was considering leaving the School because she had received an opportunity to work at a different school system. Lister Affidavit, at ¶¶ 6, 7, Exhibit D-2 (Appendix pp. 348, 349, 355). She also stated she would like to assist with administrative duties at A+ Secondary so that she could be competitive for an administrative position. *Id.* This message to Lister did not mention a desire to leave A+ Secondary because Higgins had experienced discrimination or retaliation. *Id.* Higgins was given an opportunity to serve in an administrative intern role so that she could gain experience. Lee Affidavit, at ¶ 35 (Appendix p. 5).

### 4. November 13, 2018 Intercom Incident

On November 13, 2018, Higgins became upset with Lee for calling her name over the campus intercom system to return to her duty post outside in front of the school for student drop off. Lee Affidavit, at ¶ 36 (Appendix p. 5). Lee emailed Higgins after speaking with her and noted that he and Higgins agreed that they "have always had a good relationship" and that her approach to the conversation seemed out of character. Lee Affidavit, at ¶ 37, Exhibit A-13 (Appendix pp. 5, 123-125). Lee explained that it was routine for the campus administration to make a general announcement if teachers were not at their duty posts, and that calling a teacher by name was done

if individual teachers were still not at their duty posts after the initial announcement. *Id.* He explained that this was not a written procedure, but a procedure that had been used all year.[9] *Id.*

Higgins responded and noted that the conversation went awry after their discussion of the unwritten procedure. Lee Affidavit, at ¶ 37, Exhibit A-13 (Appendix pp. 5, 123-125). She stated she was not aggressive as Lee had interpreted. *Id.* Higgins complained that she believed Lee was inconsistent with his directives, and that he talked to other staff about matters that affected her, such as covering her duty post. *Id.* She concluded that she and Lee had "started off well" and her hope was for that relationship to continue, and agreed to meet later that day. *Id.* There was no discussion of race, racial discrimination, or any other type of discrimination in Higgins's emails with Lee. *Id.*

Higgins met with Lee later that day and recounted other employees that had disciplinary incidents with Lee, including Destiny Clayton, Michael Thomas, Adrienne Scott, and Malbrew and Hammond. Higgins Depo. at pp. 105:1-5, 106:24-107:15 (Appendix p. 725). Higgins admitted that she had not taken any steps to verify her colleagues' complaints, nor had she seen any documents as to why her colleagues had disciplinary incidents, nor did she report the complaints to Human Resources. Higgins Depo. at pp. 98-99, 101-103, 104-105 (Appendix pp. 723-725). Higgins also claims that, during this meeting, she explained to Lee that "many black/African American individuals had approached her with [the concerns that there was a race-based hostile work environment]." Pet. at ¶ 8. Higgins alleges that Lee was defensive and did not acknowledge her concerns. *Id.* However, Higgins has testified that Lee never indicated or threatened that he

---

[9] During her deposition, Higgins did not recall if other teachers' names had been announced over the intercom to report to their duty stations. Higgins Depo. at p. 95:14-17 (Appendix p. 722). Higgins admitted that she was not terminated, suspended, or otherwise written up for this incident. Higgins Depo. at pp. 95:18-96:13 (Appendix p. 722). Higgins also admitted that she was not threatened with termination, nor was her pay docked, nor her duties as a teacher removed. *Id.*

would terminate her as a result of this meeting, or as a result of her conversations with her colleagues. Higgins Depo. at pp. 103, 107-108 (Appendix pp. 724, 725). She also admitted that Lee never gave her a write-up, negative evaluation, suspension, or docked her pay as a result of this meeting. Higgins Depo. at pp. 107-108 (725). Higgins testified that she did not recall reporting the events of the meeting to the School's Human Resources Department, Higgins Depo. at p. 108:9-24 (Appendix p. 725).

### 5. "Surveillance" by A+ Secondary Employee

Higgins claims that she was surveilled by another employee, "Mr. Bento,"[10] at Lee's behest, who she alleges was trying to "build a case" for her termination. Higgins Depo. at pp. 110:21-111:23, Exhibit 2 ¶ 33 (Appendix pp. 726, 767). However, Higgins admitted that she had never heard or seen any documents that Lee asked Vento to "surveil" or monitor her, and she never heard or saw any documents indicating that Vento was reporting to Lee on her activities. Higgins Depo. at pp. 111:17-112:14 (Appendix p. 726). Higgins testified that she did not recall Vento ever mentioning her employment, and she did not recall receiving anything to indicate that anyone was recommending her for termination. Higgins Depo. at p. 116:3-22 (Appendix p. 727). Though she alleges a personal relationship between Vento and Lee, Higgins had never seen them socialize outside of work. Higgins Depo. at p. 112:12-14 (Appendix p. 726). Higgins admitted that no one ever wrote her up, either in a letter of counseling, reprimand, or otherwise about any activities which Vento allegedly witnessed, nor did anyone threaten her employment, dock her pay, suspend her, or give her a negative evaluation based on any actual or perceived reports by Vento. Higgins Depo. at pp. 112:15-113:24 (Appendix pp. 726, 727).

---

[10] Defendant assumes the person referenced by Higgins is Ruben Vento, a Campus Security Monitor at A+ Secondary.

### 6. December 4, 2018 Meeting

On December 4, 2018, Higgins emailed Trotter and Lister regarding her role and her perceived lack of administrative duties. Lister Affidavit, at ¶¶ 8, 9, Exhibit D-3 (Appendix pp. 349, 357, 358). Higgins referenced a prior meeting between Malbrew, Lee, Campbell, and Terrance Gassaway, College and Career Coordinator, and stated that Malbrew had asked her to join him in that meeting, ostensibly so that she could gain administrative experience. *Id.* Higgins indicated that she was not permitted in the meeting, and that Lee explained there would be student confidentiality concerns since the meeting with Malbrew would touch on student matters, and Higgins was not in an administrative role with respect to the situation. *Id.* Higgins stated that after the meeting she felt her duty as administrative intern was no longer needed, while she maintained that she "**love[d] the environment. The students are amazing. The potential here is endless.**" *Id.* (emphasis in original). Higgins did not reference *any* of the prior alleged incidents with Lee, nor did she mention issues related to discrimination or retaliation. *See id.*

Lister responded that there were still administrative development opportunities available, but the assignments were at the discretion of the administrative team. Lister Affidavit, at ¶¶ 8, 9, Exhibit D-3 (Appendix pp. 349, 357, 358). Lister also confirmed that the administration team had a valid student confidentiality concern regarding Higgins's attendance at the meeting. *Id.* Lee also wrote to Higgins to explain the student confidentiality issues that precluded her attendance at the meeting, commend her support of Malbrew, and address potential administrative opportunities for her. Lee Affidavit at ¶ 38, Exhibit A-14 (Appendix pp. 5, 127).

### 7. January 4, 2019 Resignation

One month later, on January 4, 2019, Higgins submitted a letter of resignation, effective January 7, 2019. Lee Affidavit at ¶¶ 39, 40, Exhibit A-15 (Appendix pp. 5, 129, 130). In her

resignation email, Higgins did not make a complaint of race or racial discrimination, or discrimination of any kind. *Id.* She did not cite a hostile work environment, nor did she state that she felt compelled to resign because she could not continue to work due to the conditions at the School. *Id*.

### D.     Lawsuit

On April 27, 2020, Plaintiffs filed their Original Petition in state court, and the matter was then removed to this court. Through their lawsuit, Plaintiffs claim race or color-based discrimination prohibited by Title VII, the TCHRA, and Section 1981, as well as retaliation and a hostile work environment. Pet. at ¶¶ 52-66.

### III.     ARGUMENT: PLAINTIFFS' RACE / COLOR DISCRIMINATION CLAIMS MUST FAIL[11]

### A.     Legal Standard for Proving Race / Color Discrimination

Plaintiffs' claims of race and color discrimination under Title VII, the TCHRA, and Section 1981 are subject to the familiar analytical framework found in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) ("*McDonnell Douglas*").

Under the *McDonnell Douglas* framework, a plaintiff claiming race and/or color discrimination must first establish that he or she is (1) a member of a protected group; (2) that he or she was qualified for the position at issue; (3) was discharged or suffered some adverse employment action by the employer; and (4) was replaced by someone outside his or her protected group or was treated less favorably than other similarly situated employees outside the protected

---

[11] The framework for analyzing the Plaintiffs' claims (intentional discrimination, retaliation, and hostile work environment) is the same for claims arising under Title VII, the TCHRA, and Section 1981. *See Hernandez v. Yellow Transp., Inc.*, 670 F.3d 644, 650 (5th Cir. 2012); *Shackelford v. Deloitte & Touche, LLP,* 190 F.3d 398, 404 n.2 (5th Cir.1999). Accordingly, for brevity, Defendant will analyze each of the claims for discrimination, retaliation, and hostile work environment under Title VII, the TCHRA, and Section 1981 under the general standards found in caselaw discussing Title VII, except when a separate statutory analysis is warranted.

group. *See Roberson-King v. La. Workforce Comm'n, Office of Workforce Development*, 904 F.3d 377, 381 (5th Cir. 2018). After the plaintiff establishes a *prima facie* case, the burden shifts to the employer to provide a legitimate, non-discriminatory reason for the employment decision. *See id.* (citations omitted).[12] If the employer articulates a legitimate reason, the burden shifts back to the plaintiff to show the reason is "merely pretextual." *Id*.

In other words, to survive summary judgment on the issue of intentional discrimination, a plaintiff must present competent proof that "would allow a reasonable trier of fact to conclude that [the employer's] articulated reasons . . . were merely a pretext for discrimination" *Grimes v. Tex. Dep't of Health,* 102 F.3d 137, 143 (5th Cir. 1996). A plaintiff can avoid summary judgment if the evidence, taken as a whole: "(1) creates a fact issue as to whether each of the employer's stated reasons was not what actually motivated the employer and (2) creates a reasonable inference that [a prohibited factor] was a determinative factor in the actions of which plaintiff complains." *Id.* at 141.

Within the pretext analysis, the court does not "engage in second-guessing of the employer's business decisions." *Roberson-King*, 904 F.3d at 381. The Fifth Circuit has concluded that "[m]anagement does not have to make proper decisions, only non-discriminatory ones." *Bryant v. Compass Group USA, Inc.,* 413 F.3d 471, 478 (5th Cir. 2005). Employment discrimination laws "are not intended to be a vehicle for judicial second-guessing of business decisions, nor . . . to transform the courts into personnel managers." *Id.* (quotation omitted).

In meeting its pretext burden, the plaintiff must "produce substantial evidence indicating that the proffered legitimate nondiscriminatory reason is a pretext for discrimination," and "must rebut each discrete reason proffered by the employer." *Burton v. Freescale Semiconductor, Inc.*,

---

[12] This is a burden of production only, not persuasion; it involves no credibility assessment. *McCoy v. City of Shreveport*, 492 F.3d 551, 557 (5th Cir. 2007).

798 F.3d 222, 233 (5th Cir. 2015). This burden can be met by substantial evidence of (1) disparate treatment or (2) that the employee's explanation is false or unworthy of credence. *See Delaval v. PTech Drilling Tubulars, LLC*, 824 F.3d 476, 480 (5th Cir. 2016). Evidence is substantial if it is of such quality and weight that reasonable and fair-minded people in the exercise of impartial judgment might reach different conclusions. *See Wallace v. Seton Family of Hosps.* 777 F.App'x 83, 89 (5th Cir. 2019) (quotation omitted).

Additionally, there is a presumption that discriminatory animus was not present where the same actor responsible for the adverse employment action either hired or promoted the employee at issue. *See Spears v. Patterson UTI Drilling Co.,* 337 Fed. App'x. 416, 421-22 (5th Cir. 2009); *see also Ako-Doffou v. Univ. of Tex.*, 71 Fed. App'x. 440, 2003 Wl 2141748, at *2 (5th Cir. 2003) ("an inference against a finding of pretext is present where the same actor is responsible for the decision to both hire and fire the complaining employee"). The rationale behind the inference is that "[c]laims that employer animus exists in termination but not in hiring seem irrational" as it "hardly makes sense to hire workers from a group one dislikes (thereby incurring the psychological costs of associating with them), only to fire them once they are on the job." *Brown v. CSC Logic, Inc.*, 82 F.3d 651, 658 (5th Cir. 1996), *abrogated in part on other grounds by Russell v. McKinney Hosp. Venture*, 235 F.3d 219, 225 (5th Cir. 2000) (quotation omitted). Here, it is undisputed that Lee made the hiring recommendation for all three Plaintiffs, recommended Malbrew's non-renewal, and is the focus of Hammond and Higgins' complaints of constructive discharge. Lee Affidavit at ¶ 4 (Appendix p. 2); Hammond Depo. at p. 38:10-19 (Appendix p. 484); Higgins Depo. at p. 23:3-11, Exhibits 3 and 4; p. 35:1-10 (Appendix pp. 704, 707, 777-780). Accordingly, the presumption applies.

**B. Analysis of Claims of Race / Color Discrimination**

      1. <u>Malbrew's Claims of Race / Color Discrimination</u>

            *i. Malbrew's Performance Issues Show He Was Not Qualified for the Position*

The record evidence shows that Malbrew was not qualified to continue his role as teacher, and also demonstrates clear, legitimate, and non-discriminatory reasons for his non-renewal. As noted in Section II.A.1-5 above, Lee's recommendation to non-renew Malbrew was based on some 71 pages of documentation concerning Malbrew's performance problems. Lee Affidavit at ¶¶ 7, 8, Exhibit A-1 (Appendix pp. 3, 8-79). Notably, Malbrew's actions generated no less than ten documented instances where students, parents, and colleagues gave written statements about Malbrew's treatment of students and parents. *Id*. These statements and complaints cited Malbrew's propensity to yell, belittle, and swear at students. Lee Affidavit at ¶¶ 7, 8, Exhibit A-1 at 30-57 (Appendix pp. 3, 37-64). In one particularly severe report, Malbrew belittled a student who got nervous reading in front of his peers. Lee Affidavit at ¶¶ 7, 8, Exhibit A-1 at 32 (Appendix pp. 3, 39). Instead of encouraging the student, Malbrew kicked the child out of class, causing the child to walk the hallway in tears. *Id.* On another instance, Malbrew berated a student so loudly that other teachers came out of their classrooms into the hallway. Lee Affidavit at ¶¶ 7, 8, Exhibit A-1 at 35, 36, 54, 56 (Appendix pp. 3, 42, 43, 61, 63). Additionally, a teacher within Malbrew's department documented the multiple times that Malbrew interrupted his class and routinely use inappropriate language in the presence of students. Lee Affidavit at ¶¶ 7, 8, Exhibit A-1 at 40 (Appendix pp. 3, 47). In yet another incident, Malbrew screamed at a student because she was

unable to answer a question, and told the student that with her attitude, she would "never be anybody in life." Lee Affidavit at ¶¶ 7, 8, Exhibit A-1 at 45-47 (Appendix pp. 3, 52-54).

Lee's non-renewal recommendation also included concerns with Malbrew's attendance and failure to comply with administrative directives. Lee Affidavit at ¶¶ 7, 8, Exhibit A-1 at 68-72 (Appendix pp. 3, 75-79). These issues more than justify Lee's recommendation to non-renew Malbrew's employment at the end of the 2018-2019 school year, and demonstrate that Malbrew showed himself as not qualified to fill a teaching role with A+ Secondary.

### ii. *There is No Evidence of Pretext*

As noted above, a plaintiff's pretext burden to avoid summary judgment can only be met if the evidence, taken as a whole: (1) creates a fact issue as to whether each of the employer's stated reasons was not what actually motivated the employer, and (2) creates a reasonable inference that a prohibited factor was a determinative factor in the actions of which plaintiff complains. *See Grimes,* 102 F.3d at 14. Malbrew can do neither.

First, the factual justification underlying Malbrew's inability to control his temper and language with students is thoroughly documented. That documentation is not merely memoranda to the file from his direct supervisor, but also from Malbrew's colleagues, his students, and their parents. Lee Affidavit at ¶¶ 7, 8, Exhibit A-1 (Appendix pp. 3, 8-79). The documentation regarding Malbrew's failure to follow clock-in and -out procedures is computer generated, and contemporaneous emails note his counseling on the issue. *Id.* His failure to follow administration's instructions regarding lesson plans and scheduling his observation in a timely fashion further compound his other shortcomings. *Id.*

Malbrew acknowledged in his deposition that Lee never mentioned race when discussing his employment, or that he could not recall what Lee said.[13] Malbrew Depo. pp. 31:24-32:13 (Appendix p. 175). Malbrew instead subjectively interprets facially neutral actions as being attributable to his race. For example, Malbrew attributes the counseling letter issued by Campbell following the classroom incident involving N.L. as racially discriminatory. *See* Malbrew Depo. at p. 48 (A. "Uh-huh. I mean the document itself proves that it's racially discriminatory." Q. "How?" A. "Well, basically, you know, I got – basically, I got written up for what Mr. Lee's son said, basically. So you're punishing a Black man for what a White kid said [. . .]") (Appendix p. 179).[14] This completely ignores the fact that Lee had no involvement in any directives issued by Campbell related to the N.L. incident. Lee Affidavit at ¶ 5 (Appendix p. 2).

Malbrew also alleges that Lee engaged in discriminatory conduct during a conversation Lee had with Hammond in which Lee allegedly referred to Malbrew as "idiot." Malbrew Depo. at pp. 69:15–70:8 (Appendix p. 185). However, Hammond's own testimony concerning this conversation with Lee notes that Lee used the same word to describe N.L. Hammond Depo. at p. 54:19-22 (Appendix p. 181). Hammond further testified that Lee never used the term "Black idiot," and that when Lee purportedly referred to Malbrew as an "idiot," there was no reference to Malbrew's race. Hammond Depo. at pp. 47:12-48:12 (Appendix p. 486). Hammond further admitted that he did not go to the School's HR department, to the Superintendent, or to any of the members of the School's Board of Directors to report any concerns after this conversation with

---

[13] It stands to reason, given the nature of this case, if Lee had mentioned Malbrew's race to him, Malbrew would have alleged that specifically.

[14] When asked whether he felt it was racist for a school system to ask a teacher to provide a safe learning environment for students (as the September 13, 2018 letter from Ms. Campbell did), Malbrew responded that it was not done for any white teacher. Malbrew Depo. at p. 52:21-25 (Appendix p. 180). When asked if there were white teachers' classes where students were talking about shooting illegal immigrants, Malbrew responded that he did not recall. Malbrew Depo. at p. 53:1-5 (Appendix p. 181).

Lee. Hammond Depo. at pp. 75:14-76:22 (Appendix p. 493). Thus, Malbrew's reliance on a report by Hammond that Lee used the term "idiot" when talking about Malbrew is misplaced, and Malbrew cannot use the alleged statements to infer discriminatory animus to Lee. Moreover, even if Lee did use the term "idiot" when referencing Malbrew, and even if we were to assume that the statement was racially motivated, it would be a stray remark that cannot be relied upon to show discrimination or harassment.

"For comments in the workplace to provide sufficient evidence of discrimination, they must be (1) related to the protected class of persons of which the plaintiff is a member; (2) proximate in time to the termination[ ]; (3) made by an individual with authority over the employment decision at issue; and (4) related to the employment decision at issue." *Odubela v. Exxon Mobil Corp.*, 736 Fed. App'x 437, 442 (5th Cir. 2018) (quotation omitted). "Comments that do not meet these criteria are considered 'stray remarks,' and standing alone, are insufficient to defeat summary judgment." *Id.*; *see also Cervantez v. KMGP Servs. Co. Inc.*, 349 Fed. App'x. 4, 10–11 (5th Cir. 2009) ("a comment is not evidence of discrimination if it is the sole proof of pretext, or if it not made in temporal proximity to the adverse employment decision") (citations omitted). In this case, the "idiot" comment would be considered a stray remark.

In his complaint, Malbrew also identified "enormous steps" that Lee allegedly took to discriminate against him. Pet. at ¶ 40. When asked during his deposition what these "enormous steps" were, Malbrew responded "taking away my classes, being retaliatory, you know, talking about me, you know. Those all – calling me names, those –you know." Malbrew Depo. at p. 86:2-12 (Appendix p. 496). Regarding Malbrew's allegation that the change from his 8th period athletics class to a social studies special topics class was racially motivated, the class was actually changed because another class that had too many students had to be split up. Lee Affidavit at ¶¶ 41,

42, Exhibit A-16 (Appendix pp. 5, 132). Malbrew has not offered any evidence, other than his subjective belief, to contradict this explanation. Malbrew Depo. at p. 91:5-15 (Appendix p. 190). Accordingly, it is not evidence of pretext. "A plaintiff's subjective beliefs are not sufficient to create an issue of fact." *Salinas v. AT&T Corp.*, 314 Fed. App'x 696, 699 (5th Cir. 2009); *see also Price v. Marathon Cheese Corp.*, 119 F.3d 330, 337 (5th Cir.1997) ("a plaintiff cannot merely rely on his subjective belief that discrimination has occurred" to establish pretext); *Armendariz v. Pinkerton Tobacco Co.*, 58 F.3d 144, 153 (5th Cir.1995).

Another discriminatory step that Malbrew alleges is the requirement to get composite certified. Malbrew Depo. at p. 94:17-23 (Appendix p. 191). Malbrew alleged in his complaint that "Lee attempted to make it look like a department-wide requirement; however, of the three teachers (two white and Malbrew), the requirement was only enforced against Malbrew – not his white colleagues." Pet. at ¶ 10. However, Malbrew directly refuted this when he admitted in an email to Lister that this requirement was for the entire social studies department. Malbrew Depo. at pp. 97:13-99:18, Exhibit 6 (Appendix pp. 192, 272-274) (describing a "questionable effort to apply undue stress and pressure for **the entire Social Studies department**, middle school included, to be high school Social Studies composite."). In that email, Malbrew did not mention any racially discriminatory intent on the part of Lee or Defendant. *See id*. Further, Lee informed the Human Resources Department that the two other teachers who were not yet composite certified were scheduled to take the certification test that summer. Lee Affidavit, at ¶¶ 16, 17, Exhibit A-5 (Appendix pp. 3, 89-90). This statement by Malbrew eliminates any reasonable inference that race was a determinative factor in requiring the certification; rather, the requirement to encourage composite certification was department-wide by Malbrew's own admission.

Malbrew has also alleged that during the Spring 2019 semester, Lee had meetings with the social studies team that did not include him. Malbrew Depo. at p. 102:8-12 (Appendix p. 193). However, when asked about these meetings in his deposition, Malbrew could not describe any meetings that he was excluded from, just that he would "catch" Lee "huddled" with the entire history department. Malbrew Depo. at p. 102:13-20 (Appendix p. 193). Malbrew has presented no evidence that these alleged "meetings" were formal mandatory meetings of the department; his use of the word "huddle" is nebulous, at best, and is not a meeting. Malbrew has not produced evidence that race played any role in these alleged meetings or "huddles," and thus do not support pretext or discrimination.

Malbrew also claims that another teacher told his students that the social studies and science portions of the STARR test did not matter. Malbrew Depo. at p. 104:9-21; Pet. at ¶ 43 (Appendix p. 193). However, Malbrew has not produced any evidence that the teacher actually made those statements,[15] that the teacher was not counseled regarding those statements, that the statements were made in order to have some retributive effect on Malbrew, that the teacher's statement was motivated by racial animus, that the teacher did not mistakenly believe the comments to be true, or that the statements can be in any way attributed to Lee or the School. Malbrew Depo. at p. 104:9-21 (Appendix p. 193). Even if Malbrew could prove that the statement was made, for workplace comments to provide sufficient evidence of discrimination, they must be (1) related to the protected class of persons of which Plaintiff is a member; (2) proximate in time to an adverse employment action; (3) made by an individual with authority over the employment decision at issue; and (4) related to the employment decision at issue. *See Auguster v. Vermillion Parish Sch. Bd.*, 249 F.3d 400, 405 (5th Cir. 2001). Thus, even if it assumed that the comment was

---

[15] Malbrew stated that another teacher told him that Ms. Hettich had made the statement. Malbrew Depo. at p. 104:9-21 (Appendix p. 193).

made proximate in time to Lee's recommendation to non-renew Malbrew's employment, the comment fails all other prongs as it was not related to Malbrew's protected class, was not made by an individual with authority to make any employment decision over Malbrew, and was not related to Malbrew's non-renewal. Accordingly, such a remark is not evidence of discrimination by Lee or the School.

As evidence of discrimination, Malbrew refers to a March 25, 2019 social studies department meeting where Lee allegedly rejected an idea of his on how to raise student scores. Pet. at ¶ 45. Malbrew further alleges that Lee blamed him for low scores when Lee knew a white teacher had "sabotaged" him. Malbrew Depo. at pp. 112:13-113:12 (Appendix pp. 195, 196). Malbrew goes on to claim that after this meeting, his middle school classes were removed. Malbrew Depo. at pp. 113:22-114:4; Pet. at ¶ 46 (Appendix p. 196). However, the administration had already had a discussion of Malbrew's classes' test scores with him prior to the March 25, 2019 meeting. Malbrew Depo. at pp. 114:17-117:2, Exhibit 7 (Appendix pp. 196, 197, 275). In a March 20, 2019 email, Malbrew acknowledged that campus administrators had informed him that perhaps students need to hear another voice in United States History based on their recent benchmark performance; Malbrew thought the solution to improve scores was addressing test-taking skills. *See id*. In any event, Malbrew expressed that he was fine with the decision to change his class schedule if that was the consensus. *See id*. According to these emails, Malbrew knew that his STAAR benchmark grades were an issue, that the administration was considering a change to place his students with a different teacher for that purpose, and he expressed that he was "fine with it." *Id*. If anything, Malbrew's own statements reveal that his classroom changes were done for expressly non-discriminatory reasons (improvement of student outcomes), that he was aware of the proposal to change his schedule, and that he assented to the administration's solution. Because

there were legitimate, non-discriminatory reasons to change the schedule, and Malbrew knew of and assented to those changes, the scheduling changes are not evidence of pretext.

To fill Malbrew's schedule, he was assigned to teach CTE classes. Malbrew Depo. at p. 114:4-7 (Appendix p. 196). Malbrew alleged that he was placed under the supervision of Cathy Holdbrook ("Holdbrook"), the existing CTE department chair, who was white. Malbrew Depo. at pp. 130:20-131:3 (Appendix p. 200). However, Malbrew expressly stated that he was fine with the change in schedule, and his prior department chair in social studies, Faulk, was also white. Malbrew Depo. at pp. 114:17-117:2, Exhibit 7 (Appendix pp. 196, 197, 275); Lee Affidavit at ¶ 43 (Appendix p. 5). Consequently, working with another white department chair would not be a change of circumstances for Malbrew, and he had never previously complained about being in a department chaired by another white employee.

Further, modifying Malbrew's schedule was not an adverse employment action. The courts have recognized that the mere loss of some job responsibilities does not constitute an adverse employment action. *See Thompson v. City of Waco, Tex.*, 764 F.3d 500, 504 (5th Cir. 2014) (holding that a change in work schedule and request that an employee perform two additional tasks did not rise to the level of an adverse employment action); *Williams v. U.S. Dept. of the Navy,* 149 Fed. App'x. 264, 269 (5th Cir. 2005) (loss of some job duties is not an ultimate employment decision); *Hernandez v. Crawford Bldg. Material Co.,* 321 F.3d 528, 532 n.2 (5th Cir. 2003) (listing actions that are not ultimate employment decisions).

In sum, Malbrew has interpreted actions that were taken for completely race-neutral reasons and subjectively interpreted race-based motivations where none existed. If Malbrew's view of the law were correct, no white supervisor could ever take any otherwise valid action concerning a minority subordinate without the action being considered legally discriminatory.

Malbrew's race was never brought up until he filed his grievance after receiving notice of his non-renewal, and he has not offered any evidence that the legitimate, nondiscriminatory reasons for non-renewing his employment were pretext for discrimination based upon his race. Further, the Fifth Circuit has held that even an employer's incorrect assessment of the facts it relies on in making its termination decision does not constitute pretext. *See, e.g., Hervey v. Miss. Dep't of Educ.*, 404 Fed. App'x 865, 871 (5th Cir. 2010) (" an incorrect belief in the underlying facts may constitute a legitimate, nondiscriminatory reason for an adverse employment decision"); *Mayberry v. Vought Aircraft Co.*, 55 F.3d 1086, 1091 (5th Cir. 1995) (recognizing that even incorrect belief that employee's performance is inadequate constitutes legitimate, nondiscriminatory reason for decision; the question is not whether decision is erroneous, but whether decision was made with discriminatory intent); *Little v. Republic Ref. Co. Ltd.*, 924 F.2d 93, 96 (5th Cir. 1991) (finding that employer's subjective belief in employee's poor performance, even if incorrect or inadequate constitutes a legitimate, non-discriminatory reason in absence of showing of improper motive).

For these reasons, Malbrew cannot meet the requirements to make a *prima facie* case of race and/or color discrimination, nor show that the School's proffered reasons for his non-renewal are a pretext for discrimination. All of Malbrew's claims asserting race and/or color discrimination, whether under Title VII, the TCHRA, or Section 1981, must be dismissed.

2.     Hammond's Claims of Race / Color Discrimination

i.     *Hammond Cannot Make a Prima Facie Showing of Discrimination*

Hammond cannot show discrimination, as he was never subjected to an adverse employment action. In the discrimination context, an adverse employment action is an "ultimate employment decision, such as hiring, granting leave, discharging, promoting, or compensating." *Price v. Wheeler*, 834 Fed. App'x. 849, 855 (5th Cir. 2020). Here, Hammond claims that he was

"demoted" in some way, without offering supporting evidence of a demotion. When reviewing whether a demotion constitutes an adverse employment action, the inquiry into whether a "new" position is "worse" is an objective inquiry, and a plaintiff's "subjective perception that a demotion has occurred is not enough." *Alvarado v. Texas Rangers*, 492 F.3d 605, 614 (5th Cir. 2007); *see also Serna v. City of San Antonio*, 244 F.3d 479, 483 (5th Cir. 2001) ("it is insufficient for a plaintiff to show merely that he has been transferred from a job he likes to one he considers less desirable. Rather, a plaintiff must produce enough evidence to allow a reasonable trier of fact to conclude that, when viewed objectively, the transfer caused harm to the plaintiff").

Hammond has admitted that, after his alleged "demotion," he continued to perform duties as counselor for the School, and his salary remained the same. Hammond Depo. at p. 145:12-19 (Appendix p. 511). He also admitted that he never changed job titles, continued to receive his salary as a counselor, and continued to deal with students' counseling problems. Hammond Depo. at pp. 91:21-92:21 (Appendix p. 497). Hammond therefore has done nothing more than allege a subjective opinion that a demotion has occurred; this is insufficient to constitute an adverse employment action. *See Alvarado,* 492 F.3d at 613–14; *see also Serna,* 244 F.3d at 483.

Additionally, when asked if he was ever informed his duties were being given away because he was African-American, Hammond stated that he could "read the tea leaves" and cited perceived incidents with Malbrew and another African-American teacher. Hammond Depo. at p. 150:3-18 (Appendix p. 512). These are additional subjective opinions as to a perceived "demotion," and do not show evidence of an adverse employment action.[16]

---

[16] Hammond testified that the only evidence he has to indicate that Lee was a racist was the termination / non-renewal of other African-American employees and that Lee allegedly said "white people are untouchable." Hammond Depo. at pp. 155:18-156:3 (Appendix p. 513). However, Hammond clarified that Lee actually named three individuals who happened to be white as being "untouchable" rather than stating that white people generally are "untouchable." Hammond Depo. at p. 156:15-22 (Appendix p. 513).

It is undisputed, however, that Hammond was not ever recommended for termination or non-renewal by Lee or the School. Lee Affidavit at ¶ 27 (Appendix p. 4). Moreover, Hammond initially agreed to continue employment during the 2019-2020 year and then voluntarily resigned after accepting the offer of continued employment. Lee Affidavit at ¶¶ 27, 28, Exhibit A-9.1, Exhibit A-10 (Appendix pp. 4, 106-110). An employee's decision to voluntarily resign, absent a constructive discharge, is not an adverse employment action. *See, e.g.*, *Brown v. Kinney Shoe Corp.*, 237 F.3d 556, 566 (5th Cir. 2001) (holding a resignation can only constitute an adverse employment action where that resignation amounts to a constructive discharge). As discussed in Section VI below, Hammond cannot successfully assert a claim for constructive discharge.

Thus, Hammond has not presented any evidence that he suffered an adverse employment action. His claims asserting race and/or color discrimination, whether under Title VII, the TCHRA, or Section 1981, must be dismissed.

### 3. Higgins's Claims of Race / Color Discrimination

#### i. *Higgins Cannot Make a Prima Facie Case of Discrimination*

Higgins is also unable to make a *prima facie* case of race or color discrimination. To start, she was never subjected to an adverse employment action, meaning an "ultimate employment decision, such as hiring, granting leave, discharging, promoting, or compensating." *Price*, 834 Fed. App'x. at 855. Higgins does not allege that she was recommended for termination or being informed that she was slated for termination, Higgins Depo. at p. 35:1-10 (Appendix p. 707), and the record evidence is clear that she voluntarily resigned her employment to pursue an opportunity with another school system. Lister Affidavit, at ¶¶ 6, 7, Exhibit D-2 (Appendix pp. 348, 349, 355); Lee Affidavit at ¶¶ 39, 40, Exhibit A-15 (Appendix pp. 5, 129, 130). The only way for Higgins to assert an adverse employment action is to attempt to recharacterize her resignation as a

constructive discharge. *See, e.g.*, *Brown*, 237 F.3d at 566; *Garza*, 2018 WL 4855290, at *4. As discussed in Section VI below, Higgins cannot successfully assert a claim for constructive discharge.

Higgins also cannot satisfy the requirement to show that she was replaced by someone outside of her protected class, as her position of CTE teacher was ultimately filled on a full-time basis by another African-American. *See* Defendant's Supplemental Answers to Plaintiffs' First Set of Interrogatories, attached hereto as **Exhibit I**, at ¶ 9 (Appendix pp. 802, 803).

Higgins further cannot show that she was treated less favorably than others outside of her protected class. She generally claims that "there were White teachers who were performing subpar and they got opportunities to correct it; whereas, the Black employees were kind of documented out." Higgins Depo. at pp. 74:25-75:4 (Appendix p. 717). However, when asked for details, Higgins could not recall any specific white teachers to whom her claim applied. Higgins Depo. at p. 75:6-14 (Appendix p. 717). Further, when asked for details regarding her allegation that "many colleagues had come to Higgins to express their concerns that Principal Lee was fostering a racially tense and harassing workplace," Higgins only stated that Lee wanted a white teacher "to file an aggrievance on Mr. Thomas [who is black]." Higgins Depo. at p. 98:5-11 (Appendix p. 723). Higgins also claimed that another teacher, Destiny Clayton, told her a white teacher wanted a student to say that Clayton pinched him, but Higgins did nothing to verify the information that Clayton told her and did not complain to HR or to anyone else about the alleged incident. Higgins Depo. at pp. 96:20-103:7 (Appendix pp. 722-724). Higgins admitted that Lee never threatened her employment as a result of her conversations with Thomas and Clayton and in fact, she did not know if Lee was even aware of these conversations. Higgins Depo. at p. 103:14-24 (Appendix

p. 724). Higgins therefore has not provided any evidence to support a claim that other similarly-situated employees outside of her protected class were treated more favorably.

For these reasons, Higgins cannot satisfy the *prima facie* elements of her claims, and each of her claims asserting race and/or color discrimination, whether under Title VII, the TCHRA, or Section 1981, must be dismissed.

## IV.  ARGUMENT: PLAINTIFFS' RETALIATION CLAIMS MUST FAIL

### A.    Legal Standard for Proving Retaliation

When evaluating a Title VII or TCHRA (or Section 1981) retaliation claim in the summary judgment context, a plaintiff must first prove a *prima facie* case by a preponderance of the evidence that (1) he or she engaged in a protected activity; (2) an adverse employment action occurred; and (3) a causal link existed between the protected activity and the adverse employment action.[17] *See Evans v. City of Houston*, 246 F.3d 344, 351 (5th Cir. 2001); *Martin v. Kroger Co.*, 65 F. Supp. 2d 516, 554 (S.D. Tex. 1999). Protected activities generally include: (1) opposing a discriminatory practice; (2) making or filing a charge; (3) filing a complaint; or (4) testifying, assisting, or participating in any manner in an investigation, proceeding or hearing. *See, e.g., Everett v. Cent. Miss, Inc. Head Start Program*, 444 Fed. App'x. 38, 44 n.15 (5th Cir. 2011); *Grimes*, 102 F.3d at 140.

The burden then shifts to the Defendant to articulate a legitimate, non-retaliatory reason for the adverse action, at which point the burden shifts back to the Plaintiff to "adduce sufficient evidence that would permit a reasonable trier of fact to find that the proffered reason is a pretext

---

[17] An adverse employment action in the retaliation context is defined as one that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Price*, 834 Fed. App'x at 858. 2020). The courts have also noted that "the materiality requirement reflects the importance of separating significant from trivial harms." *Aryain v. Wal-Mart Stores Te. LP*, 534 F.3d 473, 484 (5th Cir. 2008) (quotation omitted).

for retaliation." *Chapple v. Tex. Health and Human Servs Comm'n*, 789 Fed. App'x. 985, 991 (5th Cir. 2019) (quotation omitted). At the pretext stage, the employee must demonstrate that the adverse action would not have occurred "but for" the employer's retaliatory motive. *See Garcia v. Prof'l Contract Servs, Inc.*, 938 F.3d 236, 241–42 (5th Cir. 2019).

### B. Analysis

#### 1. Malbrew's Retaliation Claim Must Fail

With respect to any claims of retaliation by Malbrew, he has not shown that he engaged in a protected activity prior to receiving notice of his non-renewal. Malbrew received this notice on April 10, 2019 and subsequently filed an employee grievance on April 18, 2019, in which he alleged discrimination by Lee. Lee Affidavit, ¶¶ 19, 20, Exhibit A-6 (Appendix pp. 4, 94, 95). Malbrew therefore cannot rely on his employee grievance as evidence of retaliation.

Malbrew may attempt to claim that he engaged in a protected activity by reaching out to the School's Human Resources Department in December 2018 to complain about not receiving enough support as a teacher; however, Malbrew's "complaint" to Human Resources did not make mention of race or color discrimination, or otherwise intimate that Lee was engaging in some form of unlawful employment practice. Malbrew Depo. at pp. 77:13-82:2, Exhibit 4 (Appendix pp. 187, 188, 269, 270).

Malbrew also cannot show a causal link between his participating in a protected activity and an adverse employment action, as he was informed of the non-renewal prior to filing his grievance against Lee.

And, to further undercut any argument that his non-renewal was related to participation in a protected activity, Malbrew repeatedly testified during his deposition that Lee's recommendation to non-renew was due to the September 2018 classroom incident involving N.L. *See* Malbrew

Depo. at p. 48:5-8 (Appendix p. 179) (Q: "So you were fired because of [N.L.]'s comments in your classroom on September 11, 2018? A. I believe it was the culprit, yes."); p. 56:6-8 (Appendix p. 181) (Q. "Retaliation because of something his son said? A. Correct."); p. 68:15-22 (Appendix p. 184) (Q. "Retaliation because of what his son said in your classroom? [Objection to form] A. That's the culprit. . . . That's basically what I'm saying.").

Further, the School has presented several legitimate reasons not to renew Malbrew's employment, which are discussed at length in Section II.A above. Malbrew has not presented any evidence regarding why he believes that these reasons are pretextual, other than his subjective belief, nor has he demonstrated that his non-renewal would not have occurred "but for" a retaliatory motive. Malbrew's claims of retaliation, whether under Title VII, the TCHRA, or Section 1981, must fail as a matter of law.

2.     <u>Hammond's Retaliation Claim Must Fail</u>

With respect to Hammond, Defendant recognizes that he filed an employee grievance prior to his separation from employment. However, he cannot establish the remaining elements of a *prima facie* retaliation claim, as he was not subjected to an adverse employment action and cannot demonstrate a causal relationship between his separation and his employee grievance.

Specifically, Hammond was never recommended for termination or non-renewal. Lee Affidavit at ¶ 27 (Appendix p. 4). He was, instead, offered continuing employment for the 2019-2020 school year and agreed to continue his employment. Lee Affidavit at ¶¶ 27, 28, Exhibit A-10 (Appendix pp. 4, 109, 110). Then, once the 2018-2019 school year was over, Hammond submitted a resignation notice. Lee Affidavit at ¶ 27, Exhibit A-9.1 (Appendix pp. 4, 106, 107); Hammond Depo. at p. 179:15-25; Pet. at ¶ 50 (Appendix p. 519). Hammond's decision to voluntarily resign, absent a constructive discharge, is not an adverse employment action. *See, e.g.*,

*Brown*, 237 F.3d at 566. As discussed in Section VI below, Hammond cannot successfully assert a claim for constructive discharge. Hammond also has not presented evidence showing that a reasonable worker in his position would have been dissuaded from making or supporting a charge of discrimination, as the School did not terminate, demote, or otherwise take action against Hammond after he filed his employee grievance. Simply put, Hammond has not provided any evidence to show how working conditions were so oppressive and filled with discrimination that reasonable workers in his position would have quit, especially when Hammond himself agreed to continued employment prior to filing his grievance.

Even if Hammond were somehow able to show an adverse employment action, he still cannot establish a causal link between his separation and his participation in a protected activity. Hammond may attempt to claim that he engaged in some form of protected activity by telling Malbrew that Lee was discussing the N.L. incident with other staff members and somehow "blaming" N.L.'s behavior on Malbrew. But, Hammond admitted during his deposition that he was never told by Lee that Lee intended to terminate Hammond's employment, Lee never told Hammond he was going to non-renew his contract, Hammond was not removed from his counseling position, Lee never issued Hammond a letter of counseling or letter of reprimand, and Lee never issued him a negative evaluation of his job performance. Hammond Depo. at p. 78:1-24 (Appendix p. 494).

Hammond may also try to claim that he engaged in a protected activity by sending an email to Dr. Kelree Brasseaux, Deputy Superintendent of Academics, and notifying her that he was "having some issues with Mr. Lee and retaliation." However, even if this email constituted engaging in a protected activity, Hammond never suffered any adverse action after contacting Dr. Brasseaux in that he was never told he was recommended for termination, he did not receive a

letter of counseling, he was not suspended, and he did not suffer a reduction in pay.[18] Hammond Depo. at pp. 88:16-89:15, Exhibit 8 (Appendix pp. 496, 497, 608). Once again, it is unclear how Lee or the School retaliated against Hammond by offering him employment continuing into the 2019-2020 school year.

Hammond may also claim retaliation by Lee based on Hammond participating as a "witness" in a meeting between Lee and Higgins where Higgins discussed how Lee treated her. Hammond Depo. at pp. 129:10-17, 132:23-133:5 (Appendix p. 507). But, Hammond admitted that during the meeting, Lee never threatened him with termination, never told him that he was not going to bring Hammond back the following year, and Lee did not suspend him from work as a result of his participation in the meeting. Hammond Depo. at p. 130:4-22 (Appendix p. 507). Hammond tries to circumvent this by alleging that Lee removed his counseling duties and gave them to Faulk and Holdbrook; however, Hammond has also admitted that he had no other information, other than his own belief, that Lee gave them these duties because Hammond participated in the meeting with Higgins and Lee. Hammond Depo. at p. 151:8-12 (Appendix p. 512). Further, as shown in Section II.B.2-4 above, the School has articulated legitimate reasons for reallocating some of Hammond's duties, Hammond has not presented any evidence to show these proffered reasons are pretext for retaliation.[19]

_____

[18] Moreover, in an email from Lee to Hammond on February 15, 2019, Lee expressed regret that Hammond felt there was a hostile or retaliatory work environment (due to questions concerning Hammond's handling of student schedules), and stated "***We are not replacing you with anyone***. Mrs. O'Neal and I discussed a better way to support scheduling and came to the conclusion that including a team to do scheduling until you attend more training and are better acquainted with our systems would be best." Hammond Depo. at p. 90:8-25, Exhibit 10 (Appendix pp. 497, 611-613) (emphasis added). This email shows no retaliatory action, as Hammond was affirmatively told that he was not being replaced and that the School would provide supports to help him become better acquainted with A+ Secondary's systems.

[19] Hammond claims that Campbell "had a key role in retaliation," but he testified that she never indicated to Hammond that he was going to be terminated or that he was going to be non-renewed. Hammond Depo. at pp. 177:17-178:17 (Appendix p. 519).

Simply put, Hammond has admitted that, even after he filed his grievance, no one from the School told him he would be fired or non-renewed, he was never removed from his position as counselor, he never suffered a loss of salary or benefits, and he was never reprimanded during his employment. Hammond Depo. at pp. 172:1-173:5 (Appendix pp. 517, 518). Because Hammond cannot show he was subjected to an adverse employment action or establish a causal connection between an adverse employment action and his participation in a protected activity, his retaliation claims, whether under Title VII, the TCHRA, or Section 1981, must fail.

3.    Higgins's Retaliation Claim Must Fail

Higgins also cannot make a *prima facie* showing of retaliation. To start, Higgins has not alleged that she participated in any protected activity. Her only potential arguments regarding retaliation are that Lee maliciously announced her name over the intercom on a single occasion when she was not at her duty station, and that she mentioned a "hostile environment" during a meeting with Lee. Higgins Depo. at pp. 105:1-5, 106:24-107:15 (Appendix p. 725); Lee Affidavit at ¶ 36 (Appendix p. 5). Higgins has not explained how her frustration with Lee calling her name over the intercom constitutes participation in a protected activity, and she has been unable to provide any details regarding the alleged "hostile environment" created by Lee. Higgins Depo. at pp. 98-99, 101-103, 104-105 (Appendix pp. 723-725).

Higgins also has not articulated any action taken by Defendant that would have dissuaded a reasonable person from making or supporting a charge of discrimination or opposing a perceived discriminatory practice. Higgins twice went to Human Resources to address issues she felt needed to be addressed, and Higgins has also acknowledged that she requested and received a face-to-face meeting with Lee to discuss various concerns. Higgins Depo. at pp. 87:3-13, 105:1-2, 106:24-107:1-15 (Appendix pp. 720, 725). Clearly, Higgins felt comfortable to discuss her concerns, so it

is unclear how she or a reasonable employee would have been dissuaded from raising concerns related to their treatment at work.

The only potential retaliatory acts alleged by Higgins include the purported "surveillance" by Vento when he looked for her in her classroom on two separate occasions and asked her for pictures on a field trip. Higgins Depo. at pp. 110:21-111:23; Pet. at ¶ 33 (Appendix pp. 726, 767, 768). Higgins has offered nothing other than her subjective belief that Vento was asked to surveil her by Lee, as she has acknowledged that she has no information linking her encounters with Vento to Lee or any member of the School's leadership team. Higgins Depo. at pp. 115-117 (admitting that her subjective belief based upon interactions with Vento was that Lee was "looking for something against" her) (Appendix pp. 727, 728). This subjective belief is insufficient to support a retaliation claim, and subjective beliefs are insufficient to create an issue of fact. *See Armendariz*, 58 F.3d at 153; *see also Salinas*, 314 Fed. App'x at 699; *Price*, 119 F.3d at 337.

Nor has Higgins offered an explanation as to how Vento's alleged "surveillance" would dissuade a reasonable person from filing or supporting a discrimination complaint. At most, the "surveillance," if it occurred, would be a minor annoyance, which is not actionable retaliation. *See, e.g., Stewart v. Miss. Transp. Comm'n* 586 F.3d 321, 331–32 (5th Cir. 2009) (holding that events such as personal items being taken from one's desk, having locks changed on one's door and not being allowed to close the door, chastisement by superiors and being ostracized by co-workers was not materially adverse so as to constitute adverse employment action for retaliation).

Higgins also cannot show that she was subjected to an adverse employment action. She has not provided evidence that she was recommended for termination. Higgins Depo. at p. 35:1-10 (Appendix p. 707). Instead, the record clearly shows that she voluntarily resigned her employment to pursue an opportunity with another school system. Lister Affidavit, at ¶¶ 6, 7, Exhibit D-2

(Appendix pp. 348, 349, 355); Lee Affidavit at ¶¶ 39, 40, Exhibit A-15 (Appendix pp. 5, 129, 130). The only way for Higgins to assert an adverse employment action is to attempt to recharacterize her resignation as a constructive discharge. *See, e.g.*, *Brown*, 237 F.3d at 566. As discussed in Section VI below, Higgins cannot successfully assert a claim for constructive discharge.

Once again, Higgins cannot show that she engaged in a protected activity, that an adverse employment action occurred, or that a causal link is present between the protected activity and any alleged adverse action. For these reasons, all retaliation claims by Higgins, whether under Title VII, the TCHRA, or Section 1981, must fail.

## V.  ARGUMENT: PLAINTIFFS' HOSTILE WORK ENVIRONMENT CLAIMS

### A.  Legal Standard

A hostile work environment exists "when the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Jones v. Dallas County*, 47 F. Supp. 3d 469, 483 (N.D. Tex. 2014) (quotation omitted). To establish a *prima facie* case of a racially hostile work environment, each plaintiff must show that (1) he belongs to a protected group, (2) he was subject to unwelcome harassment, (3) the harassment complained of was based on race, (4) the harassment complained of affected a term, condition, or privilege of employment, and (5) the employer knew or should have known of the harassment in question and failed to take prompt remedial action. *See Hernandez.*, 670 F.3d at 651. The Northern District summed up the law regarding what does and does not constitute harassment as follows:

> Harassment is based on race if the complained-of conduct had a racial character or purpose. Plaintiffs must demonstrate a connection between the allegedly harassing incidents and their protected status. For harassment on the basis of race to affect a term, condition, or privilege of employment, it must be sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment. Additionally, the work environment must be both

objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so. In determining whether a workplace constitutes a hostile work environment, courts must consider the following circumstances: the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.

. . .

Simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment.

*Jones*, 47 F. Supp. 3d at 483–84 (internal citations and quotation marks omitted). "Also, having one's work micromanaged may be unpleasant but does not constitute a 'greater degree of harassment than that required by a hostile environment claim.'" *Haley v. All. Compressor LLC & Copeland Corp.*, 391 F.3d 644, 652 (5th Cir. 2004) (quoting *Brown*, 237 F.3d at 566).

**B.  Analysis**

**1.  Malbrew's Claims of Hostile Environment Must Fail**

As discussed in detail in Section III.B above, Malbrew has failed to establish that he was subjected to any form of discrimination based on race or color or that a term, condition, or privilege of employment was altered due to discriminatory acts. Instead, the evidence shows that Malbrew's non-renewal was based on legitimate reasons related to his performance. Lee Affidavit at ¶¶ 7, 8, Exhibit A-1 (Appendix pp. 3, 8-79). Malbrew's deposition testimony also undercuts a claim that he was subjected to a hostile work environment, as he stated he was able to perform the tasks that he was instructed to perform during his employment. Malbrew Depo. at p. 133:23-24 (Appendix p. 201). Thus, Malbrew has not shown that the alleged harassment affected a term, condition or privilege of employment or otherwise unreasonably interfered with his work performance. Malbrew also has offered no explanation for why he never complained of a potentially racially hostile environment until *after* receiving notice of his non-renewal; it stands to reason that if his

work environment was so objectively and subjectively offensive as to create an abusive work environment from the beginning of the 2018-2019 school year (going back to the September 2018 classroom incident with N.L.), a reasonable employee would have mentioned something before learning of a non-renewal.

Malbrew also cannot claim that Defendant knew of the alleged hostile environment based on race or color while doing nothing about it. Upon receiving Malbrew's complaint, Defendant began a thorough and extensive investigation which resulted in findings that no harassment or discrimination occurred. Lee Affidavit at ¶¶ 44, 45, Exhibit A-17 (Appendix pp. 5, 134-141).

Malbrew cannot make a *prima facie* case of a hostile work environment, and his hostile environment claims, whether arising under Title VII, the TCHRA, or Section 1981, must fail.

### 2. Hammond's Claims of Hostile Environment Must Fail

Hammond claims that he was subjected to a hostile work environment once Lee "took note" of several employees approaching Hammond to discuss a racially-hostile environment, and that Lee then took actions to demote Hammond and reassign his duties to two white employees. Pet. at ¶ 30; Hammond Depo. at p. 180:3-12 (Appendix p. 519). However, as demonstrated in Section III B.2 above, Hammond has not provided evidence or even a reasonable basis to support a claim that Lee took any actions with respect to Hammond because of Hammond's race or color. Defendant has further provided legitimate reasons for all decisions concerning Hammond's employment. *See* Section II.B.2-4 above. And, Hammond has not explained why he accepted an offer of continued employment if his work environment was so toxic and hostile. Lee Affidavit at ¶¶ 27, 28, Exhibit A-10 (Appendix pp. 4, 109, 110).

Hammond has also testified that he did an "outstanding job" as counselor, and that he was able to accomplish his job duties to the expectations of the school. Hammond Depo. at p. 82:7-15 (Appendix p. 495). It is unclear how Hammond's work environment was so toxic or pervasive that

Defendant's treatment of him unreasonably interfered with his performance when he stated on the record that he did an "outstanding" job.

Hammond also cannot claim that Defendant knew of the alleged hostile environment based on race or color while doing nothing about it. Upon receiving Hammond's grievance, Defendant began a thorough and extensive investigation which resulted in findings that no harassment or discrimination occurred. Lee Affidavit at ¶¶ 46, 47, Exhibit A-18 (Appendix pp. 5, 143-148).

Hammond cannot make a *prima facie* case of a hostile work environment, and his hostile environment claims, whether arising under Title VII, the TCHRA, or Section 1981, must fail.

3.   Higgins's Claims of Hostile Environment Must Fail

Higgins claims that on or about November 13, 2018, she requested a meeting with Lee and that, during that meeting, she reported her feeling that Lee's conduct led employees to believe there was a race-based hostile work environment. Pet. at ¶ 31. This alleged hostile environment was ostensibly based on disciplinary incidents involving Lee and other African-American employees; however, Higgins's deposition testimony reflects that she had not taken any steps to verify her colleagues' alleged complaints, nor did she see any documentation related to disciplinary issues or report these concerns to Human Resources. Higgins Depo. at pp. 98-99, 101-105 (Appendix pp. 723-725). Higgins also testified that Lee never told her that she would be terminated as a result of the meeting or her alleged conversations with colleagues. Higgins Depo. at pp. 103, 107-108. She also admitted that Lee never gave her a write-up, negative evaluation, suspension, or docked her pay as a result of this meeting. Higgins Depo. at pp. 107-108 (Appendix p. 725). Higgins also could not recall reporting her meeting with Lee to Human Resources. Higgins Depo. at p. 108:9-24 (Appendix p. 725).

Higgins also claims, without supporting evidence, that she was subjected to a hostile environment due to "surveillance" conducted by Vento. Pet. at ¶ 59. But, her deposition testimony

shows that Higgins has only a subjective belief that Lee was somehow using Vento to "look[] for something against her." Higgins Depo. at pp. 115-117 (Appendix pp. 727, 728).

Higgins also has not shown that she was subjected to an adverse employment action, as she voluntarily resigned her employment to pursue opportunities with another school system. Lister Affidavit, at ¶¶ 6, 7, Exhibit D-2 (Appendix pp. 348, 349, 355); Lee Affidavit at ¶¶ 39, 40, Exhibit A-15(Appendix pp. 5, 129, 130). Higgins further testified that she believed she did a good job with the job duties she was given, she never received a negative evaluation, and she was a good employee while employed by the School. Higgins Depo. at pp. 8:23-9:11 (Appendix pp. 700, 701). And, Higgins' claims that she was subjected to a hostile environment are undercut by her communications with the School's Human Resources Department where she stated she "love[d] the environment." Lister Affidavit at ¶ 9, Exhibit D-3 (Appendix pp. 349, 357, 358).

For these reasons, Higgins cannot make a *prima facie* case of a racially hostile work environment and, as such, her hostile environment claims, whether arising under Title VII, the TCHRA, or Section 1981, must fail.

## VI. ARGUMENT: PLAINTIFFS' CONSTRUCTIVE DISCHARGE CLAIMS

### A. Legal Standard

To establish constructive discharge, a plaintiff must demonstrate that "'working conditions were so intolerable that a reasonable employee would feel compelled to resign.'" *Brown*, 237 F.3d at 566. In determining whether a reasonable employee would feel compelled to resign, courts have considered the following events relevant: (1) demotion; (2) reduction in salary; (3) reduction in job responsibilities; (4) assignment to menial or degrading work, (5) reassignment to work under a younger supervisor; (6) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation; or (7) offers of early retirement. *See id*. Constructive

discharge requires a greater degree of harassment than that required by a hostile environment claim; discrimination alone, without aggravating factors, is insufficient for a claim of constructive discharge. *See id*. Constructive discharge cannot be based upon the employee's subjective preferences for one position over another. *See Jett v. Dallas Indep. Sch. Dist*. 798 F.2d 748, 755 (5th Cir. 1986).

**B.    Analysis**

1.    <u>Hammond's Constructive Discharge Claim Must Fail</u>

Hammond claims to have been constructively discharged. Pet. at ¶ 9. This claim essentially boils down to claims that he was "demoted" or had job duties taken away. Pet. at ¶ 30. But, while claiming he was demoted, Hammond also acknowledges that his title as counselor was never changed. Hammond Depo. at pp. 72:23-73:4 (Appendix pp. 492, 493). He also alleges that he lost some nominal income because he did not receive a full stipend for service as a CTC. Hammond Depo. at p. 73:5-13 (Appendix p. 493).

However, Hammond has not provided any evidence to show that these alleged slights, even if we assume they occurred, would lead a reasonable employee to resign. For instance, Hammond admitted that he was never told that he was being terminated from the School due to any potentially negative comments in his performance evaluation. Hammond Depo. at p. 79:14-17 (Appendix p. 494). He further admitted that he never received any indication from Lee or from anyone else at the School that he was going to be terminated. Hammond Depo. at p. 79:19-25 (Appendix p. 494). And, as noted in several instances above, Hammond accepted an offer of continued employment for the 2019-2020 school year during the time period when the alleged discrimination / harassment was occurring, leaving one to question why he accepted the offer if his working

conditions were so intolerable that others in similar circumstances would feel compelled to resign. Lee Affidavit at ¶¶ 27, 28, Exhibit A-10 (Appendix pp. 4, 106-110).

Hammond cannot satisfy the elements needed to prove a constructive discharge claim, and his claim must be dismissed.

### 2. Higgins's Constructive Discharge Claim

Higgins also claims to have been constructively discharged, and that she resigned her employment "because she knew Lee was trying to have her terminated in retaliation." Pet. at ¶¶ 10, 39. Higgins cannot, however, demonstrate any of the seven factors that the Fifth Circuit has determined are probative to establishing constructive discharge. She was not demoted, her salary was not reduced, her job responsibilities were not reduced, she was not reassigned at all, whether it be to menial work or a younger supervisor, she was not subjected to badgering, harassment or humiliation calculated to encourage her resignation, and there were no offers of early retirement.

Additionally, Higgins did not attempt to resolve the perceived hostile environment or retaliation prior to her resignation, as a reasonable employee would. *See McKethan v. Texas Farm Bureau*, 996 F.2d 734 (5th Cir. 1993) (finding that a reasonable person would attempt resolution before resigning and if necessary file a discrimination claim while employed). Higgins never filed a grievance related to discrimination or harassment, or otherwise raised concerns that Lee was treating African-Americans unfairly through a formal complaint during her employment.[20]

---

[20] As noted in Section V.B.3 above, Higgins has made reference to her November 13, 2018 meeting with Lee as an alleged "report" of a hostile environment created by Lee; this environment was apparently based on Higgins's perception that other African-American employees had been unfairly disciplined. Pet. at ¶ 31. But, Higgins took no steps to verify her colleague's alleged disciplinary histories, nor did she take her concerns to Human Resources. Higgins Depo. at pp. 98-99, 101-105 (Appendix pp. 723-725). Lee also never told Higgins that she would be terminated, nor did Lee write Higgins up or assess disciplinary consequences following their conversation. Higgins Depo. at pp. 103, 107-108 (Appendix pp. 724, 725).

The evidence strongly supports a different thesis for Higgins' resignation other than constructive discharge: she sought an administrative role and wanted to be given administrative responsibilities. *See* Lister Affidavit, at ¶¶ 7-9, Exhibits D-2 and D-3 (Appendix pp. 349, 355, 357, 358). Indeed, Higgins testified that she had a conversation with Lister about the fact that she had an opportunity with another school district as early as November 2018. Higgins Depo. at p. 124:2-5 (Appendix p. 729). Higgins also was apparently disappointed that she was not given the role of department chair at the time of being hired. But, the evidence shows that Higgins was offered and accepted a position as a CTE teacher. Higgins Depo. at p. 23:3-11, Exhibits 3 and 4; p. 35:1-10 (Appendix pp. 704, 777-780). Finally, Higgins cannot explain how she felt compelled to resign when she had affirmatively informed the School that she "love[d] the environment." Lister Affidavit at ¶ 9, Exhibit D-3 (Appendix pp. 349, 357, 358).

Higgins cannot satisfy the elements needed to prove a constructive discharge claim, and her claim must be dismissed.

## VII. ARGUMENT: DEFENDANT'S IMMUNITY FROM LIABILITY FROM SECTION 1981 CLAIMS

Defendant seeks summary judgment and dismissal with prejudice of Plaintiffs' claims under Section 1981 because, despite Defendant's removal of this action from state to federal court, Defendant has immunity from liability based on its sovereign immunity. Though the Supreme Court held that a state defendant waives its *jurisdictional* immunity from suit in federal court when it removes an action to federal court, *see Lapides v. Bd. of Regents of the Univ. Sys. of Ga.*, 535 U.S. 613, 624 (2002), the Fifth Circuit clarified that a state defendant may still assert immunity from *liability* on state-law grounds as follows:

> [W]e conclude that the Constitution permits and protects a state's right to relinquish immunity from suit while retaining its immunity from liability, or vice versa, but that it does not require a state to do so. In sum, under the principles of federal law we have

> discussed, when Texas removed this case to federal court it voluntarily invoked the jurisdiction of the federal courts and waived its immunity from suit in federal court. Whether Texas has retained a separate immunity from liability is an issue that must be decided according to that state's law.

*Meyers ex rel. Benzing v. Texas*, 410 F.3d 236, 255 (5th Cir. 2005). "In sum, Texas may assert its state sovereign immunity as defined by its own law as a defense against the plaintiffs' claims in the federal courts, but it may not use it to defeat federal jurisdiction or as a return ticket back to the state court system." *Meyers,* 454 F.3d at 504 (5th Cir. 2006).

Further, the courts have noted that a plaintiff's Section 1981 claims against the Texas Health and Human Services Commission were barred by the state's sovereign immunity from liability, even when the case was removed to federal court. *See Cephus v. Tex. Health & Hum. Servs. Comm'n*, 146 F. Supp. 3d 818, 828 (S.D. Tex. 2015).

The Eleventh Amendment of the U. S. Constitution bars an individual from suing a state in federal court unless the state consents to suit or Congress has clearly and validly abrogated the state's sovereign immunity. *See Perez v. Region 20 Educ. Serv. Ctr.*, 307 F.3d 318, 326 (5th Cir. 2002). Because a state's Eleventh Amendment immunity extends to any state agency or entity deemed an "alter ego" or "arm" of the state, there is no requirement for the state itself to be a party to the suit. *Id.* Courts have held that Congress has not abrogated a state's sovereign immunity for claims under Section 1981. *See Sessions v. Rusk State Hosp.,* 648 F.2d 1066, 1069 (5th Cir. 1981); *Walker v. Tex., Office of Atty. Gen.*, 217 F. Supp. 2d 776, 779 (E.D. Tex. 2002).

With respect to open-enrollment charter schools, such as Defendant, the Texas Supreme Court has held: "**We conclude that open-enrollment charter schools act as an arm of the State government**." *El Paso Educ. Initiative, Inc. d/b/a Burnham Wood Charter School v. Amex Properties, LLC*, 602 S.W.3d 521, 530 (Tex. 2020) (emphasis added). The Southern District of Texas has also recently recognized that open-enrollment charter schools are arms of the state. *See*

*Armstrong v. Cumberland Acad.,* No. 6:20-CV-00526, 2021 WL 3207947, at *4 (E.D. Tex. July 15, 2021). In reaching this decision, the court relied on a six-factor test to determine whether an entity is an arm of the state enumerated in *Clark v. Tarrant County, Tex.*, 798 F.2d 736 (5th Cir. 1986) (the "*Clark* factors") and determined that charter schools are an arm of the State of Texas such that sovereign immunity barred the suit. *See Armstrong*, 2021 WL 3207947, at *4. Thus, Defendant seeks dismissal with prejudice of Plaintiffs' claims under Section 1981 because, despite Defendant's removal of this action from state to federal court, Defendant has immunity from liability based on its sovereign immunity as an arm of the state. *See, e.g.*, *Cephus*, 146 F. Supp. 3d at 830 (dismissing plaintiff's Section 1981 against the Texas Health and Human Services Commission due to its Eleventh Amendment immunity from liability). For these reasons, all of Plaintiffs' Section 1981 claims against Defendant must be dismissed.

## VIII.    C̲O̲N̲C̲L̲U̲S̲I̲O̲N̲ ̲A̲N̲D̲ ̲P̲R̲A̲Y̲E̲R̲

For the foregoing reasons, Defendant respectfully moves this Court to grant the Motion for Summary Judgment, enter judgment in favor of Defendant and dismiss Plaintiffs' claims with prejudice.

//

//

//

//

Respectfully submitted,

*/s/ Ricardo R. Lopez*

**Ricardo R. Lopez**
Attorney-in-Charge
State Bar No. 24013059
Email: rlopez@slh-law.com
**Joseph E. Hoffer**
State Bar No. 24049462
Email: jhoffer@slh-law.com
**Allen M. Keller**
State Bar No. 24070039
Email: akeller@slh-law.com
**SCHULMAN, LOPEZ,**
**HOFFER & ADELSTEIN, LLP**
845 Proton Road
San Antonio, Texas 78258
Telephone: 210-538-5385
Facsimile: 210-538-5384

**Christopher J. Parvin**
State Bar No. 24041656
Email: chris@parvinlaw.com
**PARVIN LAW GROUP, PC**
500 N. Akard Street, Suite 3000
Dallas, Texas 75021
Telephone: 469-607-4500
Facsimile: 469-607-4501

**ATTORNEYS FOR DEFENDANT**

## CERTIFICATE OF SERVICE

This is to certify that on September 2, 2021, the foregoing **Brief in Support of Motion for Summary Judgment** was electronically submitted for filing with the Clerk for the U. S. District Court, Northern District of Texas, using the electronic case filing system of the Court. Counsel for Plaintiffs is registered and will receive notification of electronic filing via the Court's CM/ECF system as follows:

Susan E. Hutchison, sehservice@fightsforright.com, Hutchinson & Foreman PLLC, 505 Pecan St., Ste. 102, Fort Worth, Texas 76102.

*/s/ Ricardo R. Lopez*
Attorney for Defendant