# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| RICARDO MALBREW, FRANK HAMMOND, AND NIJA HIGGINS, | § § § | |
| Plaintiffs, | § § | |
| | § | Civil Action No. 3:20-CV-01364-E |
| v. | § § | |
| A+ CHARTER SCHOOLS d/b/a A+ Academy Secondary, | § § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM OPINION AND ORDER

Before the Court is Defendant A+ Charter School d/b/a A+ Academy Secondary's ("the School") Motion for Summary Judgment. (ECF No. 30). Plaintiffs Ricardo Malbrew, Frank Hammond, and Nija Higgins (collectively "Plaintiffs") filed this suit against the School asserting claims of race or color-based discrimination, retaliation, hostile work environment, and constructive discharge. The School seeks dismissal of all Plaintiffs' claims under Title VII of the Civil Rights Act of 1964 ("Title VI"),[1] Chapter 21 of the Texas Labor Code (referred herein as the Texas Commission on Human Rights Act or "TCHRA"),[2] and 42 U.S.C. § 1981 ("Section 1981"). After considering the parties' briefing, appendices, and applicable law, the Court **GRANTS** the School's Motion for Summary Judgment.

---

[1] Title VI is codified at 42 U.S.C. § 2000e.

[2] The Court recognizes that the Commission on Human Rights has been replaced with the Texas Workforce Commission's civil rights division. *Waffle House, Inc. v. Williams*, 313 S.W.3d 796, 798 n.1 (Tex. 2010) (citing TEX. LAB. CODE ANN. § 21.0015). Throughout this memorandum opinion and order, the Court refers to Texas Labor Code Chapter 21 as the TCHRA.

# I.   BACKGROUND[3]

This case involves employment disputes with regard to three different employees at the academic institution A+ Academy Secondary[4]—a domestic educational entity that conducts business throughout the State of Texas. (ECF No. 1-1 at 5). Plaintiffs are African Americans who were all employed at the School sometime during the 2018–2019 academic year. (ECF No. 1-1 at 6–7). During Plaintiffs' employ, the Principal for the School was Norman Lee III ("Lee"), a Caucasian male, and the Vice Principal was Lisa Campbell ("Campbell"), a Caucasian female. (ECF No. 1-1 at 6).

## A.   Malbrew's Employment

During the 2018–2019 academic year, Plaintiff Ricardo Malbrew ("Malbrew") was employed by the School as a history teacher. (ECF No. 1-1 at 6). On or about September 11, 2018, Malbrew taught a history lesson about the "intersection of contemporary social justice issues, immigration, and the early-20th Century labor movement." (ECF No. 1-1 at 7). Many of Malbrew's students were Hispanic and undocumented immigrants. (ECF No. 1-1 at 7). Lee's son—N.L.—was in Malbrew's class, and as alleged, blurted out during the lesson that he would shoot any illegal aliens or Mexicans who tried to come across the U.S. border. (ECF No. 1-1 at 7). Allegedly, this was not the first incident involving inappropriate comments made by N.L. during Malbrew's class, and after this particular outburst Malbrew had a private discission with N.L. to explain why his comments were discriminatory and offensive to his classmates. (ECF No. 1-1 at 8). As alleged, N.L. then began to feel intimidated by his Hispanic classmates—who were severely

---

[3] The Court must view the evidence in the light most favorable to Plaintiffs as the summary judgment nonmovant and must draw all reasonable inferences in their favor; thus, the Court presents the factual background as alleged by Plaintiffs. *See e.g, Coim USA Inc. v. Sjobrand Inc.*, 663 F. Supp. 3d 684, 686 (N.D. Tex. 2023).
[4] A+ Academy Secondary is the specific academic institution under the umbrella of A+ Charter Schools where Plaintiffs were employed.

offended by his comments—and complained to his parents that he was being mistreated. (ECF No. 1-1 at 8).

On or about September 13, 2018, Malbrew was called into a meeting with Campbell to discuss the situation with Lee's son. (ECF No. 1-1 at 8). Allegedly, "after Malbrew explained what happened in class, including N.L.'s severely discriminatory and offensive commentary, Campbell began to shockingly equivocate for N.L.'s behavior and trivialize Malbrew's concerns." (ECF No. 1-1 at 8). Malbrew suggested that N.L. be moved to another classroom, but rather, at the end of the meeting, Campbell gave Malbrew a written reprimand for failing to (a) provide a safe academic environment and (b) refrain from discussing controversial historical topics. (ECF No. 1-1 at 8). Later that evening, N.L.'s mother—a teacher at A+ Academy elementary school—came to the School and told Malbrew that he was creating a hostile learning environment for her son. (ECF No. 1-1 at 8).

When Malbrew showed up to school the following week, he learned that Lee had removed Malbrew's high school classes and, as alleged, had given them to Caucasian teachers. (ECF No. 1-1 at 8). Allegedly, by the end of the 2018–2019 academic year, Lee had changed Malbrew's schedule, took away his classes, and subjected him to classroom upheaval at least six times. (ECF No. 1-1 at 8).

In October 2018, Malbrew was allegedly told by Plaintiff Frank Hammond ("Hammond") and another African American teacher at the School that Lee was "inappropriately discussing the N.L. incident with several people, blaming N.L.'s behavior on Malbrew." (ECF No. 1-1 at 10). In response, Malbrew wrote a formal complaint to the School's Human Resources ("HR") Department "regarding Lee's retaliatory actions and the hostile work environment." (ECF No. 1-1 at 10).

On or about November 28, 2018, Lee emailed Malbrew to inform him that students and parents had made complaints about him. (ECF No. 1-1 at 11). During the meeting, Malbrew was told that "there were, allegedly, *undocumented* complaints that Malbrew cursed in his classroom, which Malbrew knew to be entirely untrue." (ECF No. 1-1 at 11).

On or about December 3, 2018, Malbrew emailed the School's HR Representative regarding multiple issues including "(a) his feeling that teacher authority was being intentionally undermined by administration, and (b) a student who said '*fuck you*' to Malbrew." (ECF No. 1-1 at 12). As alleged, Lee sent Malbrew home after this email. (ECF No. 1-1 at 12). On December 4, 2018, the School's HR Representative responded to Malbrew's email stating that HR would be contacting him to investigate regarding his complaint. (ECF No. 1-1 at 12). Malbrew was then contacted by the HR Director, who was allegedly apologetic and asked Malbrew to give him a chance to remedy the situation. (ECF No. 1-1 at 13).

According to Malbrew, things only got worse at the outset of the spring 2019 semester, beginning with Lee again changing Malbrew's class schedule and removing his athletics/football class. (ECF No. 1-1 at 13). Allegedly, Lee also began having team meetings with Malbrew's Caucasian colleagues, while intentionally excluding him. (ECF No. 1-1 at 13).

Around this time, Lee told Malbrew he would have to get composite certification, which Malbrew stated was not a necessary requirement for his position. (ECF No. 1-1 at 13). Malbrew alleged that this was a disguised retaliatory and discriminatory requirement, as he was the only one of the three teachers—the other two of who were Caucasian—whom such requirement was enforced against. (ECF No. 1-1 at 13).

By March 19, 2019, Malbrew's students' scores had dipped. (ECF No. 1-1 at 14). In or around March 25, 2019, "Lee held a meeting with the entire social studies department regarding

benchmark, but in actuality, the meeting was open retaliation against Malbrew." (ECF No. 1-1 at 14). Lee began the meeting by asking Malbrew how he proposed to get the scores up, but when Malbrew replied, Lee summarily dismissed him. (ECF No. 1-1 at 14). As alleged by Malbrew, "it soon became clear that Lee intended the meeting to be a retaliatory and discriminatory shaming, and Malbrew was not going to make any ground." (ECF No. 1-1 at 14). Shortly after this meeting, Lee removed all of Malbrew's middle school classes, and put him under the supervision of a Caucasian teacher. (ECF No. 1-1 at 15).

On or about April 12, 2019, Malbrew received a non-renewal letter, stating that his contract with the School would not be renewed for the following academic year. (ECF No. 1-1 at 15). Beginning on April 18, 2019, Malbrew appealed the non-renewal determination citing a "systemic pattern of retribution, hostility, and discriminatory practices against past and present employees of the School. (ECF No. 1-1 at 15). Following an investigation, the School's Grievance Officer denied Malbrew's reinstatement and reported no evidence was found to support Malbrew's allegations. (ECF No. 1-1 at 15).

**B.     Hammond's Employment**

During the 2018–2019 academic year, Hammond was employed by the School as a counselor. (ECF No. 1-1 at 6). Around September 2018, Hammond had a meeting with Lee wherein Lee brought up the incident between N.L. and Malbrew. (ECF No. 1-1 at 9). Lee informed Hammond that the School was getting complaints from parents about N.L.'s comment and that Lee planned to keep N.L. at home for a few days to allow everything to die down. (ECF No. 1-1 at 9). Allegedly, Lee told Hammond, " *I would handle Malbrew myself, but I don't want it to look like I'm retaliating against him, so I'm gonna have my wife do it.* " (ECF No. 1-1 at 9).

Around November 2018, multiple minority employees allegedly began to approach Hammond "regarding the racially-hostile and discriminatory work environment that was perpetuated by Principal Lee." (ECF No. 1-1 at 10). According to Hammond, Lee began to notice Hammond's involvement in these discussions, and took action to effectively demote Hammond. (ECF No. 1-1 at 10). As alleged, Lee stripped Hammond of his counseling and records-review duties, giving them to two Caucasian teachers—neither of which were qualified to render counseling or review student records. (ECF No. 1-1 at 10).

On or about August 2, 2019, Hammond resigned from his position, citing unresolved race discrimination and retaliation "as a result of Defendant's refusal to protect people of color in the workplace." (ECF No. 1-1 at 15).

## C.    Higgins' Employment

Prior to the start of the 2018–2019 academic year, Plaintiff Nija Higgins ("Higgins") was employed by Frisco I.S.D. and was recruited away by Lee. (ECF No. 1-1 at 7). According to Higgins, she was promised an Admin/Department Chair position at the School, but after accepting a position at the School, she was informed she would have to re-interview for the Department Chair position. (ECF No. 1-1 at 7). After she re-interviewed with Lee, Higgins was given a Career and Technical Education ("CTE") teacher position, with the Admin/Department Chair position instead given to Cathy Holbrook ("Holbrook")—a Caucasian female. (ECF No. 1-1 at 7). As alleged, Holbrook was materially less qualified than Higgins, as Higgins had a Principal's License and twenty years of CTE experience. (ECF No. 1-1 at 7).

As alleged, a few weeks into the start of the 2018–2019 academic year, Higgins was out on duty with Brittany Martinez ("Martinez"), a security guard, in the parking lot during an incident involving a parent who had violated the rules. (ECF No. 1-1 at 9). Allegedly, Higgins heard Lee

call Martinez on her walkie-talkie, asking her to spy on Adrian Scott ("Scott"), an African American female employee, who had previously expressed that she felt Lee was causing racial tension in the workplace. (ECF No. 1-1 at 9). Upon hearing this request, Martinez allegedly "looked at Higgins in terror, saying *'I can't do what he's asking me to do.'*" (ECF No. 1-1 at 9). Campbell allegedly came into Higgins' office later that day to ask her to write a letter regarding the incident in the parking lot, and to state that Martinez was the aggressor. (ECF No. 1-1 at 9). Although Higgins could not agree with that assessment of Martinez's behavior, she agreed to write a factual account of the situation for Campbell. (ECF No. 1-1 at 9).

As alleged, by this point in the year, many colleagues had come to Higgins to express their concerns that Principal Lee was fostering a racially tense and harassing workplace. (ECF No. 1-1 at 9). Sometime after the parking lot incident, Scott expressed to Higgins that she felt Lee and Campbell were plotting to have her terminated, as she was being strangely monitored. (ECF No. 1-1 at 10). Soon thereafter, both Scott and Martinez were removed from their positions with the School. (ECF No. 1-1 at 10).

On or about November 13, 2018, Higgins had a meeting with Lee in which she informed him that "she felt as if his actions and behaviors were causing employees to believe there was a race-based hostile work environment." (ECF No. 1-1 at 11). As alleged, Higgins' goal of this meeting was to help Lee change the culture of the School and address employees' concerns, but Lee became defensive and refused to acknowledge any concerns. (ECF No. 1-1 at 11). According to Higgins, Lee ultimately disregarded her concerns entirely, stating, "*'Well, my black friends have never said anything.'*" (ECF No. 1-1 at 11).

Shortly after this meeting, Higgins alleged that she began to experience surveillance by Lee and his surrogates. (ECF No. 1-1 at 11). She first noticed the monitoring when she went to the

bathroom and asked another teacher to watch her room. (ECF No. 1-1 at 11). While Higgins was gone, Lee's "versatile employee" Bento, came looking for her, which Higgins alleged had never happened before. (ECF No. 1-1 at 11). According to Higgins, Bento did any task asked of him by Lee, and they also maintained a personal relationship outside of work. (ECF No. 1-1 at 12). After Higgins noticed Bento monitoring and following her movements on more than one occasion, she confronted him. (ECF No. 1-1 at 12). As alleged, Bento responded, "*I'm my own person!'* [] which immediately indicated to Higgins that Bento had been sent by someone else, as Higgins never said anything about Bento not being his own person." (ECF No. 1-1 at 12). As alleged, Bento further stated, "*Listen, I'm not like that—I don't think you did anything.*" (ECF No. 1-1 at 12). According to Higgins, she understood at that point that the purpose of such surveillance was for Lee to build a case for her termination. (ECF No. 1-1 at 12).

On January 3, 2019, Higgins resigned from her position, claiming that her termination was imminent, and a termination on her "long, flawless record" would make it difficult for future employment opportunities. (ECF No. 1-1 at 13).

## D.    Procedural Framework

On or about July 17, 2019, Hammond filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") and the Texas Workforce Commission ("TWC"). (ECF No. 1-1 at 16). Hammond's charge asserted (i) race discrimination and (ii) retaliation— indicating such discrimination began in November 2018 and was a continuing action. (ECF No. 1-1 at 16). Hammond received his right-to-sue notice from the EEOC on January 30, 2020, but was denied the same from the TWC on the basis that his charge was untimely filed, stating "*the last date of harm was 11-30-18.*" (ECF No. 1-1 at 16). Hammond counters that

TWC's determination was factually inaccurate and that his charge was filed timely—as the charge was a "continuing action." (ECF No. 1-1 at 16).

On or about July 17, 2019, Malbrew filed a charge of discrimination with the EEOC and TWC, also alleging (i) race discrimination and (ii) retaliation against the School. (ECF No. 1-1 at 16). Malbrew received his right-to-sue notices on February 15, 2020, and March 17, 2020, from the EEOC and TWC, respectively. (ECF No. 1-1 at 16–17).

On or about July 17, 2019, Higgins also filed a charge of discrimination with the EEOC alleging (i) race discrimination and (ii) retaliation. (ECF No. 1-1 at 17). She received her right-to-sue notice from the EEOC on January 30, 2020. (ECF No. 1-1 at 17).

On April 27, 2020, Plaintiffs filed their claims against the School in state court, and the School timely removed to federal court. (ECF No. 1). Plaintiffs proceed on their Original Complaint, (ECF No. 1-1), wherein each assert claims of (i) race discrimination, (ii) retaliation, and (iii) hostile work environment, in violation of Title VII, the TCHRA, and Section 1981. (ECF No. 1-1 at 17–18). Hammond and Higgins also assert claims of constructive discharge. (ECF No. 1-1 at 6).

On September 2, 2021, the School filed its motion for summary judgment to dismiss all of Plaintiffs' claims, (ECF No. 30), along with its brief in support, (ECF No. 31), and its appendix in support, (ECF No. 32). On October 7, 2021, Plaintiffs responded, (ECF No. 39), along with their brief in support, (ECF No. 40), and their appendix in support, (ECF No. 41). The School replied on October 21, 2021. (ECF No. 42). Thus, the School's motion for summary judgment is fully briefed and ripe for adjudication.

## II.  Legal Standard

Summary judgment is appropriate when the pleadings and evidence on file show "there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248. A court must view all evidence and "draw all reasonable inferences in favor of the nonmoving party." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). A court "may not make credibility determinations or weigh the evidence" in ruling on the motion. *Reeves*, 530 U.S. at 150; *Anderson*, 477 U.S. at 254–55. Moreover, the evidence the non-movant provides must raise "more than . . . some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586 (1986). The evidence must be such that a "reasonable jury could return a veridct for the nonmoving party." *Anderson*, 477 U.S. at 248. "If the nonmoving party fails to meet this burden, the motion for summary judgment must be granted." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1076 (5th Cir. 1994).

The "party seeking summary judgment always bears the initial responsibility" of showing the court there is no genuine issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A party with the burden of proof on an issue "must establish beyond peradventure all of the essential elements of the claim or defense to warrant judgment in his favor." *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986) (emphasis omitted). When, as here, a nonmovant bears the burden of proof, the movant may demonstrate it is entitled to summary judgment either by (1) submitting evidence that negates the existence of an essential element of the nonmovant's claim or affirmative defense, or (2) arguing there is no evidence to support an essential element of the nonmovant's

claim or affirmative defense. *Celotex*, 477 U.S. at 322–25. There is "no genuine issue as to any material fact [if] a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323; *see generally Bank One, Tex., N.A. v. Prudential Ins. Co. of Am.*, 878 F.Supp. 943, 962 (N.D. Tex. 1995) (quoting *Fontenot*, 780 F.2d at 1194) (discussing affirmative defenses).

Once the movant has made this showing, the burden shifts to the nonmovant to establish there is a genuine issue of material fact so that a reasonable jury might return a verdict in its favor. *Celotex*, 477 U.S. at 324. "[C]onclusory allegations, speculation, and unsubstantiated assertions" will not satisfy the nonmovant's burden. *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1429 (5th Cir. 1996) (en banc), *superseded by statute on other grounds*, 28 U.S.C. § 636(b)(1). A court "resolve[s] factual controversies in favor of a nonmoving party . . . only when an actual controversy exists, that is, when both parties have submitted evidence of contradictory facts." *Olabisiomotosho v. City of Houston*, 185 F.3d 521, 525 (5th Cir. 1999). When a plaintiff fails to defend a claim in response to a summary judgment motion, the claim is deemed abandoned. *See Black v. Panola Sch. Dist.*, 461 F.3d 584, 588 n.1 (5th Cir. 2006) (concluding that the plaintiff abandoned her retaliatory abandonment claim when she failed to defend the claim in response to a motion to dismiss).

"A party opposing such a summary judgment motion may not rest upon mere allegations contained in the pleadings, but must set forth and support by summary judgment evidence specific facts showing the existence of a genuine issue for trial." *Ragas v. Tennessee Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998) (citing *Anderson*, 477 U.S. at 255–57). The Fifth Circuit has explained:

> The party opposing summary judgment is required to identify specific evidence in the record and to articulate the precise manner in which that evidence supports his

or her claim.... "Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment." *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915–16 & n. 7 (5th Cir.), *cert. denied*, 506 U.S. 832, 113 S.Ct. 98, 121 L.Ed.2d 59 (1992).

*Ragas*, 136 F.3d at 458. Regarding assertions of fact, Federal Rule of Civil Procedure 56 states:

[i]f a party fails ... to properly address another party's assertion of fact as required by Rule 56(c), the court may ... (2) consider the fact undisputed for purposes of the motion [and] (3) grant summary judgment if the motion and supporting materials— including the facts considered undisputed—show that the movant is entitled to it[.]

Fed. R. Civ. P. 56(e)(2)-(3).

### III. PLAINTIFFS' EMPLOYMENT DISCRIMINATION CLAIMS

Plaintiffs each assert claims of intentional race discrimination, retaliation, and hostile work environment under Title VII, the TCHRA, and Section 1981 against the School. Additionally, Plaintiffs Hammond and Higgins assert claims of constructive discharge against the School. Under Title VII, "it shall be an unlawful employment practice for an employer to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). "[T]he purpose of Title VII is to protect employees from their employers' unlawful actions." *Simmons v. UBS Fin. Servs., Inc.*, 972 F.3d 664, 667 (5th Cir. 2020), *cert. denied*, 209 L. Ed. 2d 125, 141 S. Ct. 1382 (2021) (quoting *Thompson v. N. Am. Stainless, LP*, 562 U.S. 170, 178 (2011)). Like Title VII, the TCHRA serves to protect employees from their employers' unlawful actions. *Quantum Chem. Corp. v. Toennies*, 47 S.W.3d 473, 474 (Tex. 2001) (explaining that one of the TCHRA's purposes is to provide for the execution of the policies of Title VII.).

The Court will address each of these claims, beginning with intentional race discrimination, with respect to each Plaintiff individually.

## A.    Intentional Race Discrimination

"To succeed on a claim of intentional discrimination under Title VII, Section 1983, or Section 1981, a plaintiff must first prove a prima facie case of discrimination." *Wallace v. Texas Tech Univ.*, 80 F.3d 1042, 1047 (5th Cir. 1996). "A plaintiff can prove a claim of intentional discrimination by either direct or circumstantial evidence." *Russell v. McKinney Hosp. Venture*, 235 F.3d 219, 222 (5th Cir. 2000); *see, e.g., Gaalla v. Brown*, 460 F. App'x 469, 479 (5th Cir. 2012) (addressing racial discrimination). Regarding direct evidence, the Fifth Circuit has explained:

> Direct evidence [of discriminatory intent] is evidence which, if believed, proves the fact without inference or presumption.... It includes any statement or document which shows on its face that an improper criterion served as a basis—not necessarily the sole basis, but a basis—for the adverse employment action."

*Gaalla*, 460 F. App'x at 479 (internal quotations omitted). "Absent direct evidence of discriminatory intent, as is typically the case, proof via circumstantial evidence is assembled using the framework set forth in the seminal case of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L.Ed.2d 668 (1973)." *Russell*, 235 F.3d at 222. The Fifth Circuit has explained the three-step *McDonnell Douglas* framework as follows:

> "First, the plaintiff must establish a prima facie case of discrimination." *Reeves*, 120 S.Ct. at 2106. Second, the employer must respond with a legitimate, nondiscriminatory reason for its decision. *See McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. 1817. This burden on the employer is only one of production, not persuasion, involving no credibility assessments. *See Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 255–56, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). Third, if the employer carries its burden, the "mandatory inference of discrimination" created by the plaintiff's prima facie case, *Burdine*, 450 U.S. at 256 n. 10, 101 S.Ct. 1089, "drops out of the picture" and the fact finder must "decide the ultimate question: whether [the] plaintiff has proven [intentional discrimination]," *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511–12, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993).

*Russell*, 235 F.3d at 222. Regarding the third step of the *McDonnell Douglas* framework, "the plaintiff can rely on evidence that the employer's reasons were a pretext for unlawful discrimination." *Russell*, 235 F.3d at 222 (citing *McDonnell Douglas*, 411 U.S. at 804). Notably, the burden of proof remains with the employee throughout. *Saketkoo v. Adm'rs of Tulane Educ. Fund*, 31 F.4th 990, 999 (5th Cir. 2022).

"When used as parallel causes of action, Title VII and section 1981 require the same proof to establish liability." *Shackelford v. Deloitte & Touche, LLP*, 190 F.3d 398, 404 at n.2 (5th Cir. 1999) (internal citations omitted). "Similarly, the law governing claims under the TCHRA and Title VII is identical." *Shackelford*, 190 F.3d at 404 at n.2 (internal citations omitted).[5] Thus, as the proofs for these parallel claims are identical, the Court analyzes each of these claims together.

Because the Court has determined there is no direct evidence of race-based discriminatory animus as to the Plaintiffs, each Plaintiff must make a prima facie showing under the *McDonnell Douglas* framework that she: "(1) is a member of a protected group; (2) was qualified for the position at issue; (3) was discharged or suffered some adverse employment action by the employer; and (4) was replaced by someone outside [her] protected group or was treated less favorably than other similarly situated employees outside the protected group." *Offord v. City of Fulshear*, 861 F. App'x 536, 541 (5th Cir. 2021). "The prima facie case is necessarily a flexible standard that must be adapted to the factual circumstances of the case." *Turner v. Kan. City S. Ry. Co.*, 675 F.3d 887, 892 (5th Cir. 2012).

---

[5] The Texas Supreme Court has explained that claims asserted under the TCHRA should be analyzed in the same manner as its federal analogues. *See Mission Consol. Indep. Sch. Dist. v. Garcia*, 372 S.W.3d 629, 633–34 (Tex. 2012) (citations omitted) ("Because one of the purposes of the TCHRA is to 'provide for the execution of the policies of Title VII of the Civil Rights Act of 1964,' we have consistently held that those analogous federal statutes and the cases interpreting them guide our reading of the TCHRA."); s*ee, e.g.*, *Gorman v. Verizon Wireless Texas, L.L.C.*, 753 F.3d 165, 170 (5th Cir. 2014) ("The substantive law governing Title VII and TCHRA retaliation claims is identical.")

Thus, each Plaintiff must prove all four factors to establish her prima facie case. There is no dispute that each Plaintiff is a member of a protected group—African American, so the first element of all Plaintiffs' prima facie cases is met. (ECF No. 40 at 7). Then, if each Plaintiff proves the remaining three elements of his prima facie case, the burden shifts to the School to offer a legitimate, non-discriminatory reason for its decisions. If such reason is found, the burden shifts back to Plaintiffs to show such reason cited by the School is pretextual. The Court will analyze the intentional race discrimination claim as to each Plaintiff, beginning with Malbrew.

### 1.   Malbrew

Malbrew's claim of intentional race discrimination stems from the non-renewal of his contract with the School following the conclusion of the 2018–2019 academic year. (ECF No. 1-1 at 15). The School argues that Malbrew has not established his prima facie case of racial discrimination, as he fails to prove the second element: that he was qualified for the position at issue—a history teacher. (ECF No. 31 at 31). Plaintiffs counter that the School "misapprehends what the requirement for qualified means," and further explains that:

> Mr. Malbrew obtained a Bachelor's Degree in May 2002 and Master's Degree in History in May 2007. He began his doctoral program in the Fall of 2018. He was hired to teach History. Most notably, Mr. Lee testified in his deposition that as late as February 2019, he had planned on Mr. Malbrew returning. Thus, Defendant's attempts to use allegations from 2018 and January 2019 to how that Mr. Malbrew was "unqualified" are directly contradicted by Mr. Lee himself.

(ECF No. 40 at 7). The crux of Malbrew's argument that he was amply qualified is that prior to the notice of non-renewal, Lee had not engaged in conversations about terminating Malbrew.

"[I]t is not clear under the case law which factors the court should consider when determining whether an employee was qualified for his position as part of the prima facie case." *Todd v. Alcatel USA Res., Inc.*, 565 F. Supp. 2d 745, 751 (E.D. Tex. 2007). "The Fifth Circuit has indicated that in the prima facie analysis of qualification, the inquiry is limited to matters such as

whether the plaintiff has suffered physical disability, loss of a necessary professional license or some other occurrence which would render him unfit for the position for which he was hired." *Todd*, 565 F. Supp. 2d at 751. "The employee's deficiency in performing assigned job requirements is more appropriately addressed in the last step, when the burden shifts to the plaintiff-employee to offer some evidence that the proffered legitimate, nondiscriminatory reason for his termination was pretextual." *Todd*, 565 F. Supp. 2d at 751; *see Bienkowski v. American Airlines, Inc.,* 851 F.2d 1503, 1505 n. 2, n. 3 (5th Cir. 1988); *Pena v. Wyndham Anatole Hotel*, No. 3:03-CV-1814-AH, 2005 WL 1500821, at *2 (N.D. Tex. June 14, 2005) ("As observed by the court in *Bienkowski,* a plaintiff's deficiency in performing assigned job requirements may be more appropriately addressed if the plaintiff seeks to demonstrate that the proffered nondiscriminatory basis for termination was pretextual, the final step in the *McDonnell-Douglas* burden shifting paradigm.")  As such, the Court will assume that Malbrew has met his burden of proof on the second element of his prima facie case.

Since the School only takes issue with the second prong—qualification—of Malbrew's prima facie case, in light of the above, the Court must conclude Malbrew's prima face case has been established. Thus, the burden shifts to the School to offer some evidence that the non-renewal occurred for some legitimate, nondiscriminatory reason. Here, the School more than carried its burden of enunciating legitimate, non-discriminatory reasons for the non-renewal of Malbrew's employment contract. The School sets forth seventy-one pages of documentation regarding poor performance incidents involving Malbrew, which ultimately resulted in his termination. (*See* ECF No 32-1 at 8–79). The School specifically offers evidence of ten documented incidents where students, parents, and colleagues gave written statements about Malbrew's behavior—explicitly noting his propensity to yell, belittle, and swear at parents. (ECF No. 31 at 31).

In one particularly severe report, Malbrew belittled a student who got nervous reading in front of her peers. Instead of encouraging the student, Malbrew kicked the child out of class, causing the child to walk the hallway in tears. On another instance, Malbrew berated a student so loudly that other teachers came out of their classrooms into the hallway. Additionally, a teacher within Malbrew's department documented the multiple times that Malbrew interrupted his class and routinely used inappropriate language in the presence of students. In yet another incident, Malbrew screamed at a student because she was unable to answer a question, and told the student that with her attitude, she would "never be anybody in life."

(ECF No. 31 at 31–32; ECF No. 32-1 at 8–79). The School further asserts that the non-renewal recommendation also included concerns with Malbrew's attendance and failure to comply with administrative directives. (ECF No. 31 at 32).

Since the School clearly pronounced numerous, justified reasons for non-renewing Malbrew, the question becomes whether Plaintiff proves such reasons to be pretext. The Court concludes that the School's reasons for Malbrew's non-renewal are legitimate and not pretextual. Other than bare denials,[6] Malbrew failed to produce any evidence to rebut the comprehensive evidence of his poor performance as a teacher presented by the School. Of particular interest is that "Malbrew acknowledged in his deposition that Lee never mentioned race when discussing his employment, or that he could not recall what Lee said." (ECF No. 31 at 33). Malbrew also argues that "if there were ongoing issues regarding allegations that Mr. Malbrew couldn't control his temper or language, it would've been dealt with administratively and placed within his service record." (ECF No. 40 at 24). Such argument is not persuasive. Although Malbrew had the requisite academic degrees and had not been subject to termination in the past, such prior qualifications do not affect the credibility of the School's explanation for his termination. *See Todd*, 565 F. Supp.

---

[6] *See* ECF No. 40 at 24 ("The alleged 71-pages of documentation concerning issues with his teaching performance are a fabrication."); *see also* ECF No. 40 at 25 ("The accusation that Mr. Malbrew failed to follow administrative instructions concerning lesson plans and scheduling observations in a timely manner is false.").

2d at 753 (noting that plaintiff's satisfactory record in the past does not affect the credibility of defendant's employment explanation).

The decision not to re-employ Malbrew was based on his unacceptable performance as a teacher and was not motivated by any racial animus. The Court grants summary judgment as to the School on Malbrew's claim of intentional race discrimination.

> 2. *Hammond*

With regard to Hammond, the parties solely dispute whether Hammond satisfied the third factor in establishing his prima facie case—whether he suffered an adverse employment action. "To establish a discrimination claim under Title VII or § 1981, a plaintiff must prove that he or she was subject to an adverse employment action—a judicially-coined term referring to an employment decision that affects the terms and conditions of employment." *Thompson v. City of Waco*, 764 F.3d 500, 503 (5th Cir. 2014). "To adequately plead an adverse employment action, plaintiffs need not allege discrimination with respect to an ultimate employment decision." *Hamilton v. Dallas Cnty.*, 79 F.4th 494, 506 (5th Cir. 2023). "Instead, a plaintiff need only show that she was discriminated against, because of a protected characteristic, with respect to hiring, firing, compensation, or the terms, conditions, or privileges of employment." *Hamilton*, 79 F.4th at 506. The phrase "terms, conditions, or privileges should be broadly construed." *Harrison v. Brookhaven Sch. Dist.*, 82 F.4th 427, 430 (5th Cir. 2023). *Hamilton* left "'for another day the precise level of minimum workplace harm a plaintiff must allege on top of showing discrimination in one's terms, conditions, or privileges of employment' . . . but made clear that 'Title VII does not permit liability for de minimus workplace trifles.'" *Sambrano v. United Airlines, Inc.*, No. 4:21-CV-1074-P, 2023 WL 8721437, at *2 (N.D. Tex. Dec. 18, 2023) (quoting *Hamilton*, 79 F.4th at 505).

Hammond alleges the School intentionally discriminated against him by removing his job duties, and giving those duties to unqualified Caucasian employees. (ECF No. 1-1 at 18). The School asserts that Plaintiffs have shown zero evidence of a demotion or recommendation of termination or non-renewal—thus no adverse employment action occurred. (ECF No. 31 at 39–41). Plaintiffs put forth two avenues of adverse employment actions Hammond was subjected to: (i) demotion, and (ii) constructive discharge. (ECF No. 40 at 8–15).

"To establish a demotion, an employee must show a loss in duties, benefits, or compensation." *Peterson v. City of Dallas*, 135 F. App'x 635, 638 (5th Cir. 2005). Reassignment from a "prestigious" position to a less desirable one is insufficient to establish an adverse employment action. *See Peterson*, 135 F. App'x at 638. Further, a "plaintiff's subjective perception that a demotion has occurred is not enough." *See Forsyth v. City of Dallas*, 91 F.3d 769, 774 (5th Cir. 1996).

Hammond alleges that as part of his duties as counselor, he was assigned the role of Campus Testing Coordinator ("CTC"). (ECF No. 40 at 9). In the fall of 2018, Lee appointed another individual as the CTC for the high school and assigned Hammond the role of Co-CTC with two others. (ECF No. 40 at 9). Hammond claims that the other Co-CTC's left him out of the discussions and implementation concerning the end of course exams, and instead he had the role of picking up and dropping off the testing materials. (ECF No. 40 at 9). He further alleges that any information or ideas he provided was ignored by the others. (ECF No. 40 at 9). Specifically, Hammond argues that his curriculum duties were taken from him and "he, a certified counselor, was forced to report to, and be supervised by, two individuals who were not certified counselors but who were performing those functions." (ECF No. 40 at 10). Hammond points to one more incident to attempt to prove his alleged demotion: Hammond had put into place graduation success

plans for ten at-risk seniors, but Lee appointed Caucasian teachers with no counseling experience to instead handle the graduation plans. (ECF No. 40 at 10). Ultimately, these teachers did nothing but accept the prior graduation success plans Hammond had developed earlier that year. (ECF No. 40 at 11).

Additionally, Hammond admitted that he continued to perform duties as counselor for the School and his salary remained the same. (ECF No. 32-5 at 38) (deposition of Frank Hammond).[7] He also admitted that he never changed job titles, continued to receive his salary as a counselor, and continued to deal with students' counseling problems. (ECF No. 32-5 at 24) (deposition of Frank Hammond).[8] Hammond does not convincingly show that his perceived change in responsibility was a demotion. Further, his "subjective perception" is insufficient to prove a demotion has occurred. *See Forsyth*, 91 F.3d at 774. Thus, Hammond failed to establish that he was subject to a demotion. Plaintiffs' other avenue of an adverse employment action—constructive discharge—also fails as will be explained below. *See* § III.D.1.

In sum, as Hammond fails to prove the occurrence of an adverse employment action, he cannot make out his prima facie case, and summary judgment must be granted to the School on Hammond's intentional race discrimination claim.

---

[7] Q. And at that point, were – do you recall receiving a change to your salary as a counselor from A+ Charter School?
A. I don't recall.
Q. When your testing coordinator duties were removed, did you still have other duties as a counselor for the school?
A. Yes.
[8] Q. Well, but, again, you never changed job duties – or job titles, excuse me, you were always a counselor at A+ Charter School; isn't that right?
A. I changed duties, but I just kept the title.
Q. Okay. And you were paid as a counselor, were you not?
A. I – I got my salary, but I still wasn't doing my duties.
Q. Well, you got your counseling salary, did you not?
A. I wasn't – I wasn't doing the counseling duties. I was – I got my salary. Yes, I did get my salary.
…
Q. Were you still dealing with individual students?
A. I was dealing with students as far as counseling problems, but not the academic aspect.

3.      *Higgins*

The School contests the third and fourth elements of Higgins' prima facie case of intentional race discrimination—namely that she was not subject to an adverse employment action, nor was she replaced by someone outside her protected class or treated less favorably than others outside her protected class.

The Court concludes that Higgins was not replaced by someone outside her protected class. When Higgins resigned from the School on January 3, 2019, Holbrook assumed Higgins' duties as a CTE teacher. (ECF 32-8 at 2–3). However, this was a temporary replacement. The School hired Stuart Pearson—an African American male—as a full-time replacement for Higgins on April 15, 2019. (ECF 32-8 at 2–3). "Demonstrating that a temporary replacement was outside of the protected class is insufficient to establish a *prima facie* case of discrimination when the permanent replacement is in the plaintiff's class." *Pizzolato v. French Mkt. Corp.*, No. CIV.A. 13-6528, 2015 WL 5254698, at *4 (E.D. La. Sept. 9, 2015); *see Mercer v. Capitol Mgmt. and Realty, Inc.,* 242 Fed. Appx. 162, 163 (5th Cir. 2007) (holding that the fact that a temporary replacement is outside the protected class is immaterial if the permanent replacement is within the same protected class).

Because the School permanently replaced Higgins with an African American individual—a member of Higgins' protected class—she cannot make out the fourth element of her prima facie case of race discrimination. The Court pretermits discussion of the adverse employment action element as unnecessary. Accordingly, the Court grants summary judgment in favor of the School on Higgins' intentional race discrimination claim.

**B.      Retaliation**

Plaintiffs also allege retaliation against the School. "Title VII's antiretaliation provision forbids employer actions that discriminate against an employee (or job applicant) because he has

opposed a practice that Title VII forbids or has made a charge, testified, assisted, or participated in a Title VII investigation, proceeding, or hearing." *Saketkoo*, 31 F.4th at 999.

"Retaliation claims are likewise subject to the *McDonnell Douglas* burden-shifting framework" if the plaintiff attempts to prove retaliation by circumstantial evidence. *Owens v. Circassia Pharms., Inc.*, 33 F.4th 814, 826 (5th Cir. 2022). Thus, "if the plaintiff makes a prima facie case, the burden then shifts to the employer to articulate a legitimate, nondiscriminatory or nonretaliatory reason for its employment action." *Newbury v. City of Windcrest, Texas*, 991 F.3d 672, 678 (5th Cir. 2021). If the employer does so, "the burden shifts back to the plaintiff to prove that the proffered reason is pretext for the discriminatory or retaliatory purpose." *Newbury*, 991 F.3d at 678. "Again, the burden of persuasion remains with the employee throughout." *Saketkoo*, 31 F.4th at 1000.

"There are three elements to a prima facie case of retaliation under Title VII: (1) that the plaintiff engaged in activity protected by Title VII, (2) that an adverse employment action occurred, and (3) that a causal link existed between the protected activity and the adverse action." *Anthony v. Donahoe*, 460 F. App'x 399, 404 (5th Cir. 2012). "The mere fact that some adverse action is taken after an employee engages in some protected activity will not always be enough for a prima facie case." *Owens*, 33 F.4th at 835. "Nevertheless, close timing between the protected activity and adverse action can establish the causal link required to assert a prima facie case." *Owens*, 33 F.4th at 835.

> "At first glance, the ultimate issue in an unlawful retaliation case—whether the defendant discriminated against the plaintiff because the plaintiff engaged in conduct protected by Title VII—seems identical to the third element of the plaintiff's prima facie case—whether a causal link exists between the adverse employment action and the protected activity." "However, the standards of proof applicable to these questions differ significantly." "The ultimate determination in an unlawful retaliation case is whether the conduct protected by Title VII was a

'but for' cause of the adverse employment decision." "The standard for establishing the 'causal link' element of the plaintiff's prima facie case is much less stringent."

*Saketkoo*, 31 F.4th at 1001.

1. *Malbrew*

The School argues that Malbrew cannot prove his prima facie case of retaliation as (i) he has not shown that he engaged in a protected activity prior to receiving notice of his non-renewal, and (ii) he cannot show a causal link between participating in a protected activity and an adverse employment action, thus failing to prove the first and third elements of his prima facie case. (ECF No. 31 at 44).

The Court agrees with the School that Malbrew's prima facie case of retaliation must fail because a causal link cannot be established between Malbrew's protected activity and his non-renewal. Malbrew received his notice of non-renewal on April 10, 2019, and subsequently filed an employee grievance on April 18, 2019—thus the protected activity occurred ***after*** the adverse employment action occurred. (*See* ECF No. 31 at 44) (emphasis added).

"In a claim of protected opposition, an employee must at least have referred to conduct that could plausibly be considered discriminatory in intent or effect, thereby alerting the employer of its discriminatory practices." *Allen v. Envirogreen Landscape Pros., Inc.*, 721 F. App'x 322, 326 (5th Cir. 2017) (per curiam). Moreover, a "general allegation of hostility is not enough." *Allen*, 721 F. App'x at 326. In *Saketkoo*, the court concluded that nothing in the record supported the claim that the plaintiff reported behavior as discriminatory before the administrators made the decision not to renew her contract. *See* 31 F.4th at 1000. The exact same situation presents itself

here. The record is devoid of evidence that Malbrew reported Lee's behavior as discriminatory before Malbrew was given his notice of non-renewal.[9]

Plaintiffs heavily rely on the incident with Lee's son—N.L.—to support their conclusion that Malbrew was retaliated against. (ECF No. 40 at 39–44). The incident involved controversial topics, including racism, but did not lead to a conclusion that the School's conduct was itself discriminatory. Plaintiffs fail to present any evidence on how such incident is retaliatory—rather they merely describe in detail the events surrounding the incident with N.L.

Because Malbrew fails to establish a causal link between his engagement in protected activity and his non-renewal by the School, he has failed to make a prima facie case of retaliation. Thus, the Plaintiffs' claim of retaliation as to Malbrew must be dismissed, and summary judgment must be granted to the School on this claim.

2. *Hammond*

As to Hammond, the School contests the second and third element of Hammond's prima facie case of retaliation. It is undisputed that Hammond filed an employee grievance prior to his separation from employment—thus constituting "protected activity." (ECF No. 31 at 45). However, as stated both above and below, the Court concludes that Hammond was never subject to an adverse employment action—he was never recommended for termination or non-renewal, and he cannot successfully assert a constructive discharge claim. *See* §§ III.A.2; III.D.1. As the occurrence of an adverse employment action is required to successfully assert a claim of retaliation, the absence of such action here is detrimental to Hammond's retaliation claim.

---

[9] The School contends that Malbrew contacted the School's HR Department in December 2018, but his complaint "did not make mention of race or color discrimination, or otherwise intimate that Lee was engaging in some form of unlawful employment practice," thus, it could not have alerted Lee to his alleged discriminatory practices. (ECF No. 33 at 44).

Thus, Hammond's prima facie case of retaliation fails, and summary judgment must be granted in favor of the School on Hammond's retaliation claim.

3.     *Higgins*

In order to establish her prima facie case of retaliation, Higgins must show (1) she engaged in protected activity, (2) she was subject to an adverse employment action, and (3) that a causal link between the protected activity and adverse action existed. *See Anthony*, 460 F. App'x at 404.

The School argues that Higgins cannot make a prima facie showing of retaliation as not a single element of the requisite prima facie case is met. (ECF No. 31 at 49–50). Plaintiffs put forth an array of facts in an attempt to show Higgins engaged in protected activity. (*See* ECF No. 40 at 46–50). Specifically, Plaintiffs cite an email exchange between Lee and Higgins that led to an in-person meeting where Higgins attempted to "express concerns she had about a racially hostile work environment." (ECF No. 40 at 48). For purposes of this analysis, the Court will assume such evidence is sufficient to successfully establish Higgins' engagement in protected activity—satisfying the first element of her prima facie case.

Next, Higgins must establish she was subject to an adverse employment action. Plaintiffs argue two avenues of alleged adverse action—(i) failure to promote, and (ii) constructive discharge. As explained below, the Court concludes Higgins was not subject to constructive discharge. *See* § III.D.2. Thus, the only adverse action left for Higgins to assert a potentially successful claim of retaliation is failure to promote. The Court declines to analyze the merits of Higgins' failure to promote claim, as it unnecessary for this analysis; but rather assumes Higgins successfully proves her failure to promote claim. As such, Higgins has satisfied the first two elements of her prima facie case.

Lastly, Higgins must prove a causal link between the protected activity and the adverse employment action. This is where her retaliation claim fails. Higgins alleges that her failure to

promote occurred prior to the start of the 2018–2019 academic year, when she was hired by the School. (*See* ECF No. 1-1 at 7). Higgins' involvement in protected activity occurred ***after*** her employment began at the School, and throughout the fall semester of 2018. (*See* ECF No. 40 at 47–50) (emphasis added). There is no causal link between her protected activity and her failure to be promoted, as her failure to promote occurred first. For retaliation to occur, an employer must have taken some adverse employment action *after* an employee engaged in protected activity. *See Owens*, 33 F.4th at 835 (emphasis added). Therefore, as Higgins cannot demonstrate a causal link between the protected activity and the adverse employment action, her prima facie case of retaliation fails, and the Court grants summary judgment to the School on this claim.

## C.    Hostile Work Environment

Plaintiffs also allege claims of hostile work environment against the School. To establish a claim of hostile work environment under Title VII, each plaintiff must prove she: "(1) belongs to a protected group; (2) was subjected to unwelcome harassment; (3) the harassment complained of was based on race; (4) the harassment complained of affected a term, condition, or privilege of employment; (5) the employer knew or should have known of the harassment in question and failed to take prompt remedial action." *Hernandez v. Yellow Transp., Inc.*, 670 F.3d 644, 651 (5th Cir. 2012). "For harassment on the basis of race to affect a term, condition, or privilege of employment, as required to support a hostile work environment claim under Title VII, it must be sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Ramsey v. Henderson*, 286 F.3d 264, 268 (5th Cir. 2002). But, the Fifth Circuit has also routinely held that "similarly sporadic and abrasive conduct is neither severe nor pervasive." *Saketkoo*, 31 F.4th at 1003. "Whether an environment is hostile or abusive depends on a totality of circumstances, focusing on factors such as the frequency of the conduct, the severity

of the conduct, the degree to which the conduct is physically threatening or humiliating, and the degree to which the conduct unreasonably interferes with an employee's work performance." *Weller v. Citation Oil & Gas Corp.*, 84 F.3d 191, 194 (5th Cir. 1996). The burden lies with plaintiffs asserting a Title VII race-based hostile work environment claim. *See Abner v. Kansas City S. R. Co.*, 513 F.3d 154, 166–67 (5th Cir. 2008).

     *1.   Malbrew*

The School asserts that Malbrew cannot make out a prima facie case of hostile work environment. Specifically, the School argues that Malbrew "failed to establish that he was subjected to any form of discrimination based on race or color or that a term, condition, or privilege of employment was altered due to discriminatory acts." (ECF No. 31 at 51). Plaintiffs fail to respond to the School's hostile work environment argument, instead repeating the facts surrounding Malbrew's employment, specifically the incident with NL.[10] (*See* ECF No. 40 at 39–44). Because the burden lies with the employee throughout this analysis, Malbrew's failure to prove—or even address—his hostile work environment claim, or to direct the Court to pertinent evidence regarding this claim, is detrimental. Accordingly, Malbrew's hostile work environment claim must fail, and the Court grants summary judgment in favor of the School on this claim.

     *2.   Hammond*

The School argues that Hammond's claim of hostile work environment also fails as Hammond failed to provide "evidence or even a reasonable basis" to support his claim that Lee took action because of Hammond's race. (ECF No. 31 at 52). Further, the School contends that Hammond "has not explained why he accepted an offer of continued employment if his work environment was so toxic and hostile." (ECF No. 31 at 52). The Court agrees with the School. As

---

[10] Plaintiffs combine their retaliation and hostile work environment responses. (*See* ECF No. 40 at 39–50).

was the case with Malbrew, Plaintiffs fail to sufficiently respond to the School's hostile work

environment argument as to Hammond. (*See* ECF No. 40 at 44–46). The only potentially relevant

evidence put forth by Hammond to support his hostile work environment claim is this:

> The results of that meeting were that errors committed by Mr. Spurgin were
> attributed to Mr. Hammond, and Mr. Lee continued to make misrepresentations
> about counseling errors allegedly made by Mr. Hammond, which were invented by
> Mr. Lee as part of retaliation against Mr. Hammond for his involvement regarding
> Ms. Higgins' complaint of a hostile work environment as well as his son's actions.
> Mr. Lee also attempted to convince administrators such as Deputy Superintendent
> of Academics Dr. Kelree Brasseaux that major counseling errors were being
> committed by Mr. Hammond in my position as counselor which would pose an
> issue with some students not graduating.

(ECF No. 40 at 45). However, such facts do not evidence conduct that is "sufficiently severe or

pervasive to alter the conditions of the victim's employment and create an abusive working

environment." *Ramsey*, 286 F.3d at 268. When viewing Hammond's evidence in light of the

"totality of circumstances," it does not rise to the level of a hostile work environment. *See Weller*,

84 F.3d at 194. As Hammond fails to meet his burden of proving the presence of a hostile work

environment, his claim must fail, and summary judgment must be granted as to the School on

Hammond's hostile work environment claim.

   3.   *Higgins*

       The School argues that there is no evidence—other than Higgins' subjective belief—that

she was subjected to a hostile work environment. Higgins' response begins with a recitation of her

failure to promote claim—which is irrelevant to the analysis here. Higgins devotes the majority of

her response to the email exchange mentioned above between Lee and Higgins that led to an in-

person meeting where Higgins attempted to express her concerns about a racially hostile work

environment. (*See* ECF No. 40 at 48–50). Higgins contends that race was a topic of this meeting

between Lee and Higgins, and that after this meeting Lee allegedly "began treating Ms. Higgins

differently and more negatively." (ECF No. 40 at 48). However, the record is devoid of any facts

or evidence to support this conclusory assertion. Higgins bears the burden of establishing that Lee treated her "differently and more negatively," and she fails to offer any supporting information. Without more, such bare-bones evidence cannot support a finding of a hostile work environment.

Accordingly, Higgins cannot succeed on her hostile work environment claim, and the Court grants summary judgment in favor of the School on this claim.

## D.   Constructive Discharge

Plaintiffs Hammond and Higgins also assert claims of constructive discharge against the School. "A plaintiff who advances a hostile-environment constructive discharge claim must show working conditions so intolerable that a reasonable person would have felt compelled to resign." *Vallecillo v. U.S. Dep't of Hous. & Urb. Dev.*, 155 F. App'x 764, 768 (5th Cir. 2005); *see Pa. State Police v. Suders*, 542 U.S. 129, 141 (2004) ("The inquiry [for constructive discharge] is objective: Did working conditions become so intolerable that a reasonable person in the employee's position would have felt compelled to resign?"). It must be noted that "constructive discharge requires a greater degree of harassment than that required by a hostile environment claim." *Brown v. Kinney Shoe Corp.*, 237 F.3d 556, 566 (5th Cir. 2001). "A successful claim of constructive discharge entitles an employee who resigned to recover all damages available for formal discharge." *Aryain v. Wal-Mart Stores Texas LP*, 534 F.3d 473, 480 (5th Cir. 2008).

> The Fifth Circuit has identified several factors relevant to a claim of constructive discharge: (1) demotion; (2) reduction in salary; (3) reduction in job responsibilities; (4) reassignment to menial or degrading work; (5) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation; or (6) offers of early retirement that would make the employee worse off whether the offer were accepted or not.

*Perret v. Nationwide Mut. Ins. Co.*, 770 F.3d 336, 338 (5th Cir. 2014); *see also Aryain,* 534 F.3d at 481; *Hunt v. Rapides Healthcare Sys., LLC,* 277 F.3d 757, 771–72 (5th Cir. 2001). "Discrimination alone, without aggravating factors, is insufficient for a claim of constructive

discharge, as is a discriminatory failure to promote." *Brown*, 237 F.3d at 566. Additionally, "a plaintiff may be constructively discharged if the employer gives the employee an ultimatum to quit or be fired." *Perret*, 770 F.3d at 338. "However, in these ultimatum cases, courts have required something beyond the employee's subjective belief that termination was inevitable." *Perret*, 770 F.3d at 339.

From the outset, the Court notes that "constructive discharge requires a greater degree of harassment than that required by a hostile environment claim," and the Court concluded above that Plaintiffs failed to present evidence sufficient to survive summary judgment on their hostile work environment claims. *See Brown*, 237 F.3d at 566. Regardless, the Court will now analyze Hammond's and Higgins' constructive discharge claims.

### 1.    *Hammond*

The School contends that Hammond cannot satisfy the elements needed to prove a constructive discharge claim, and even if Hammond was demoted or had job duties taken away, he "has not provided any evidence to show that these alleged slights, even if we assume they occurred, would lead a reasonable employee to resign." (ECF No. 31 at 55). Most notably, the School reiterates that Hammond accepted an offer of continued employment for the 2019–2020 school year during the time period when the alleged discrimination was occurring—refuting the idea that his "working conditions [were] so intolerable that a reasonable person would have felt compelled to resign." *See Vallecillo*, 155 F. App'x at 768; (ECF No. 31 at 55–56).

In opposition, Plaintiffs recite various reports made by Hammond to administration and HR concerning "what he perceived as race discrimination and retaliation." (ECF No. 40 at 12). After such complaints and various conversations, Hammond decided to leave the employ of the School on August 2, 2019, when it became "clear to him that the retaliation and misrepresentations of Mr. Lee would continue." (ECF No. 41 at 14). Further, Hammond alleged that:

He was afraid that if Mr. Lee continued with his course of action and then terminated Mr. Hammond, he would not be able to find another job. Mr. Hammond dreaded going in to work each day and lived in fear of the next thing that would be falsely charged against him. He spent each day worried about documenting every aspect of what he was doing to defend himself. It was clear that the allegations were increasing in frequency and scope and if he were fired based upon such allegations, he would be forced to repeat them to any subsequent employer. There is no way Mr. Hammond would be able to get another job. He felt that his certification was on the line and thus, his career and livelihood.

(ECF No. 40 at 14). Hammond's subjective belief that he was being discriminated against and that such discrimination would persist at the School until his career was no longer viable is not supported by the evidence. The Court has concluded that Hammond was not subject to discrimination. Under Fifth Circuit precedent, even if Hammond had been discriminated against, his constructive discharge claim would fail because "discrimination alone, without aggravating factors, is insufficient for a claim of constructive discharge." *See Brown*, 237 F.3d at 566; *see also Perret*, 770 F.3d at 339 ("courts have required something beyond the employee's subjective belief that termination was inevitable").

As Hammond cannot prove that he was subject to constructive discharge, the Court grants summary judgment as to the School on Hammond's constructive discharge claim.

    *2.    Higgins*

As to Higgins, the School argues that she cannot demonstrate any of the seven factors probative of constructive discharge as laid out by the Fifth Circuit—specifically "[s]he was not demoted, her salary was not reduced, her job responsibilities were not reduced, she was not reassigned at all, whether it be to menial work or a younger supervisor, she was not subjected to badgering, harassment, or humiliation calculated to encourage her resignation, and there were no offers of retirement." (ECF No. 31 at 56).

In support of her claim, Higgins puts forth an array of facts—much of them unavailing. In fact, a large portion is a verbatim recitation of the facts put forth in her retaliation claim. (*See* ECF

No. 40 at 17–19, 48–49). Higgins recites other African American teachers' experiences with discrimination at the School, as well as her alleged surveillance by Bento[11]—Lee's "versatile employee"—that began shortly after her meeting with Lee in which she addressed the alleged racially hostile work environment at the School. (ECF No. 40 at 19–20). Higgins states the following:

> Ms. Higgins' career is her life. It means everything to her. When she began to realize that it was in jeopardy should she be fired or should her Principal's license be threatened, she became very fearful []. When she saw Ms. Campbell press actual criminal charges against Ms. Scott after bumping into her in an office, she had tremendous anxiety. When Ms. Higgins heard that Mr. Lee misrepresented to Ms. Clayton that there was "evidence" that Ms. Clayton had abused a student, when in reality it was fabricated, she also had tremendous anxiety. Ms. Higgins thought daily about the fact that all it takes is one administrator to fabricate an allegation or allegations to ruin a career. Ms. Higgins considered that Mr. Lee had out into writing (and copied to HR) that she was "aggressive" and "agitated" when she was simply trying to have a conversation with him. Because it was clear to Ms. Higgins that she was not "redeemable" to him after she raised a racially hostile work environment and because of how other African American teachers had been handled, Ms. Higgins felt that she had to resign to save her health and her career and she tendered a letter of resignation on January 4, 2019.

(ECF No. 40 at 20–21) (internal citations omitted).

Plaintiffs' argument rests on Higgins' subjective beliefs of the situation instead of facts. Plaintiffs fail to prove that the School's alleged conduct rises to the degree of constructive discharge. The Court has concluded that the School did not discriminate against Higgins, but even if it did, under binding Fifth Circuit precedent, such discrimination would not be enough. Once again, "discrimination alone, without aggravating factors, is insufficient for a claim of constructive discharge." *See Brown*, 237 F.3d at 566. Thus, Higgins' constructive discharge claim must fail, and the Court grants summary judgment as to the School on this claim.

---

[11] Plaintiffs refer to this individual as "Bento," while the School refers to him as "Vento." The Court is unsure which is correct, but both names refer to the same individual for the purposes of this memorandum opinion and order.

### IV.   Conclusion

For the reasons enumerated above, the Court **GRANTS** the School's motion for summary judgment, thereby all of Plaintiffs' claims are **dismissed with prejudice**. A final judgment will be issued following this memorandum opinion and order.


**SO ORDERED:** August 22, 2024.

Ada E. Brown
UNITED STATES DISTRICT JUDGE